PEOPLE v JACKSON

Docket No. 51655. Submitted December 3, 1981, at Detroit.—Decided April 5, 1982.

Robert B. Jackson was charged with first-degree murder, conspiracy to commit first-degree murder and possession of a firearm during a felony. Following a jury trial in Wayne Circuit Court, Horace W. Gilmore, J., defendant was found guilty of second-degree murder and conspiracy to commit second-degree murder. Prior to trial, defendant moved to suppress certain confessions which he had made to the police, including a confession which he had given on the day after he had been arraigned. The trial court held that all the confessions were admissible. During the trial, one of the coconspirators, who had testified at the preliminary examination, at first indicated that he did not want to testify at trial and then changed his mind and indicated he wished to testify. The attorney representing this witness requested that he be allowed to withdraw as counsel for the witness. The trial judge then informed the witness that his trial testimony could be used in any later proceedings against

REFERENCES FOR POINTS IN HEADNOTES

[1] 29 Am Jur 2d, Evidence § 547.

Admissibility of confession as affected by delay in arraignment of prisoner. 19 ALR2d 1331.

Construction and application of provisions of Omnibus Crime Control and Safe Streets Act of 1968, as amended (18 USCS § 3501(c)), that defendant's confession shall not be inadmissible in evidence in federal criminal prosecution solely because of delay in arraignment. 12 ALR Fed 377.

[2] 29 Am Jur 2d, Evidence § 590.

[3] 21A Am Jur 2d, Criminal Law §§ 989, 990.

[4] 21A Am Jur 2d, Criminal Law § 736.

29 Am Jur 2d, Evidence §§ 555, 556.

[5] 75 Am Jur 2d, Trial § 113.

[6, 7] 81 Am Jur 2d, Evidence § 445.

Physiological or psychological truth and deception tests. 23 ALR2d 1306.

[8] 16 Am Jur 2d, Conspiracy §§ 5, 13.

[9, 10] 16 Am Jur 2d, Conspiracy § 39.

[10] 5 Am Jur 2d, Appeal and Error § 838.

the witness and informed the witness of the consequences of perjury. The witness then again changed his mind, refused to testify and his preliminary examination testimony was read into the record. Defendant appeals. *Held:*

1. The trial court did not err in admitting into evidence the various confessions secured prior to defendant's arraignment. Even if there was an unnecessary delay between the arrest and arraignment, it is clear that the delay in arraignment was not used as a tool to extract the confessions. Since the Court of Appeals from the record before it cannot say with a definite and firm conviction that the trial court erred in its determination that the confessions were freely and voluntarily given, the determination of the trial court will not be overturned on appeal.

2. Since the defendant at no time during the police interrogation sought to exercise his right to counsel, the mere fact that he did request assigned counsel at his arraignment does not vitiate his post-arraignment confession in view of the fact that before that post-arraignment confession defendant was fully informed of his rights and chose to make the additional confession without the presence of counsel.

3. In view of the fact that the coconspirator first chose not to testify at trial and then changed his mind, coupled with the withdrawal of counsel for that witness, the trial court did not err in informing the witness that he would be subject to prosecution for perjury if he offered untruthful testimony at trial. The remarks of the trial court were clearly for the purpose of protecting both the interests of the witness and the integrity of the trial proceedings rather than calculated to drive the witness from the stand.

4. The fact that one of the prosecution's witnesses had undergone hypnosis prior to trial did not vitiate the testimony of that witness, since the trial testimony of the witness was consistent with the statements given by that witness prior to undergoing hypnosis. Under these circumstances, the trial court was justified in concluding that the trial testimony was limited to pre-hypnotic recollections.

5. The crime of conspiracy to commit second-degree murder cannot logically exist, since the nature of the crime would be a planned agreement to commit a criminal act which by definition is committed without premeditation and deliberation. The trial court, accordingly, erred in charging the jury with conspiracy to commit second-degree murder, and the conviction of that crime must be set aside.

Affirmed in part, reversed in part.

J. H. Gillis, J., dissented in part. He would not set aside the conviction for conspiracy to commit second-degree murder, since a jury, in the exercise of its power to dispense mercy, may render a verdict which is logically inconsistent. He would affirm in full.

OPINION OF THE COURT

1. CRIMINAL LAW — EVIDENCE — CONFESSIONS — DELAY IN ARRAIGNMENT.

An unnecessary delay between arrest and arraignment does not automatically require suppression of an incriminating statement made during the period of the delay, rather suppression is required only where the delay in arraignment is used as a tool to extract the statement (MCL 764.26; MSA 28.885).

2. APPEAL — CONFESSIONS — VOLUNTARINESS.

A determination by a trial court that a statement given by a defendant was voluntary and admissible will not be overturned on appeal unless the appellate court has a definite and firm conviction on appeal that the trial court erred in its determination.

3. CRIMINAL LAW — RIGHT TO COUNSEL — WAIVER.

The question of whether a criminal defendant has knowingly waived his right to counsel after that right has once been asserted requires review of the individual circumstances of the case, and the defendant's subsequent waiver of right to counsel should be viewed with suspicion; the prosecuting attorney carries a heavy burden in proving that the defendant made a knowledgeable and voluntary waiver of his right to counsel.

4. CRIMINAL LAW — ASSISTANCE OF COUNSEL — CUSTODIAL INTERROGATION.

A defendant's request for counsel at his arraignment does not vitiate the voluntariness of a statement given to the police without benefit of counsel following such request where the defendant had made no request for counsel during the giving of statements prior to his arraignment and where, at the time of the post-arraignment statement, defendant was informed of his right to counsel.

5. CRIMINAL LAW — WITNESSES — PERJURY.

It is not error for a trial judge to inform a coconspirator who indicates a wish to testify of the consequences of such testimony relative to any subsequent trial of the coconspirator and to inform such witness of the possibility of prosecution for

perjury if his testimony is untruthful where the record clearly establishes that the actions of the trial judge were to protect both the integrity of the trial process and the interests of the witness and were not a calculated attempt to discourage the witness from testifying.

6. WITNESSES — HYPNOSIS.

A witness whose memory has been restored or created through hypnosis may not testify about incidents recalled only under hypnosis but may testify about those aspects of a case remembered prior to undergoing the hypnosis.

7. WITNESSES — HYPNOSIS.

The recently adopted standards relative to the use of hypnosis as an investigative tool should be prospectively applied to cases tried after August 17, 1981.

8. CONSPIRACY — CRIMINAL LAW.

The crime of conspiracy is a separate and distinct offense from the substantive offense, and the punishment for that crime is for the mutual agreement between two or more persons to commit the substantive offense; while it is unnecessary to prove the completion of the substantive offense in order to convict of conspiracy, it must be established that the conspirators had the requisite intent to commit the substantive offense.

9. CONSPIRACY — CRIMINAL LAW — SECOND-DEGREE MURDER.

It is improper to charge the jury as to conspiracy to commit second-degree murder since such a crime cannot logically exist, it being anomalous to speak in terms of planning to commit a crime which by definition is committed without premeditation and deliberation.

PARTIAL CONCURRENCE AND PARTIAL DISSENT BY J. H. GILLIS, J.

10. CONSPIRACY — CRIMINAL LAW — SECOND-DEGREE MURDER — APPEAL.

A jury verdict in a trial for conspiracy to commit first-degree murder of conspiracy to commit second-degree murder, even if such a crime logically cannot exist, need not be overturned on appeal, since a jury, as part of its power to dispense mercy, may return a verdict for an illogical lesser offense.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Edward Reilly Wilson,* Prin-

cipal Attorney, Appeals, and *A. George Best, II,*
Assistant Prosecuting Attorney, for the people.

*James Krogsrud,* Assistant State Appellate De-
fender, for defendant on appeal.

Before: DANHOF, C.J., and J. H. GILLIS and BRON-
SON, JJ.

DANHOF, C.J. Following a jury trial defendant
was found guilty of murder in the second degree,
MCL 750.317; MSA 28.549, and conspiracy to com-
mit murder in the second degree, MCL 750.157a;
MSA 28.354(1) and MCL 750.317; MSA 28.549. He
was sentenced to two concurrent terms of life
imprisonment. Defendant appeals as of right.

Defendant's convictions arose from the shooting
death of Rothbe Elwood Perry. Defendant and a
codefendant, Mildred Perry, the victim's wife, were
tried together by separate juries. Two other code-
fendants, Michael White and Chare (also known as
Charles) Knight, had their cases severed from that
of defendant.

I

*Did the trial court err in finding that defen-
dant's confessions were voluntary and admissible?*

The record in the instant case indicates that on
July 30, 1979, codefendant Chare Knight confessed
to the crime and implicated defendant, who was
arrested by the Detroit police that same day. On
July 31, 1979, at approximately 2 p.m., defendant
was transferred to the custody of the Livonia
police and transported to the Livonia Police Sta-
tion. At approximately 3:30 p.m. defendant made
his first oral confession. Defendant made tape

recorded confessions at 5:52 p.m. and again at 8:48 p.m. because of the poor quality of the 5:52 p.m. tape recording. On August 1, 1979, at approximately 10 a.m., defendant took a polygraph exam and then made another oral confession. At 12:30 p.m. that same day defendant made a written confession. Defendant was arraigned at 4:30 p.m. on August 1, 1979. Defendant requested an attorney at the time of his arraignment. At approximately 10 a.m. on August 2, 1979, defendant made another confession.

A *Walker*[1] hearing was held prior to trial. At the conclusion of the hearing, the court found that all of the incriminating statements made by defendant were voluntary and admissible.

Defendant initially argues that the trial court should have suppressed his confessions made prior to arraignment because the delay in arraigning defendant was used to exert psychological pressure and to extract his confessions.

Unnecessary delay between arrest and arraignment is prohibited by MCL 764.26; MSA 28.885. However, this statute does not automatically require suppression of an incriminating statement where there has been a delay between arrest and arraignment. *People v Ewing (On Remand)*, 102 Mich App 81, 85; 300 NW2d 742 (1980). See also *People v Hamilton*, 359 Mich 410, 416-417; 102 NW2d 738 (1960). Rather, an incriminating statement should only be excluded where the delay in arraignment was used as a tool to extract the statement. *People v White*, 392 Mich 404, 424; 221

---

[1] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965).

NW2d 357 (1974), *People v Antonio Johnson,* 85 Mich App 247; 271 NW2d 177 (1978).

Upon review of the testimony presented at the *Walker* hearing, we are not persuaded that the delay between defendant's arrest and arraignment was used to extract a confession. During this time period, each of the questioning sessions was preceded by *Miranda*[2] warnings and, if the testimony of the officers present during the sessions is believed, defendant volunteered his statements. Since we do not possess a definite and firm conviction that the trial court erred in finding that defendant's statements were voluntary and admissible, that determination is affirmed. *People v McGillen #1,* 392 Mich 251, 257; 220 NW2d 677 (1974).

Defendant next argues that his August 2, 1979, confession should have been suppressed because counsel was not present at that confession even though defendant had requested counsel at his arraignment. Defendant acknowledges that *Miranda* warnings were given before the August 2, 1979, confession but asserts that these warnings were not sufficient to establish a knowing and intelligent waiver.

An almost identical fact situation was addressed in *People v Bladel,* 106 Mich App 397; 308 NW2d 230 (1981). After extensively reviewing the law in this area, *Bladel* held that the question of a knowledgeable and voluntary waiver after the right to counsel has once been asserted requires a review of the individual circumstances of the particular case, with the prosecution carrying a heavy bur-

[2] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

den in proving that defendant's waiver was knowledgeable and voluntary. See also *People v Parker,* 84 Mich App 447; 269 NW2d 635 (1978). Applying this standard to the instant case, we would find that the prosecution has established a knowledgeable and voluntary waiver of defendant's right to counsel on August 2, 1979.

However, the Supreme Court's recent decision in *People v Paintman,* 412 Mich 518; 315 NW2d 418 (1982), requires us to reexamine the appropriateness of applying the standards set out in *Bladel* to the facts of the instant case.

*Paintman* involved the consolidated appeals of two defendants, Paintman and Conklin. Both Paintman and Conklin requested counsel when questioned by police following their arrest. They again asked for attorneys when arraigned. Paintman's incriminating statement was made, apparently, three days after his arraignment. Conklin's incriminating statement was made nine days after his arrest and initial request for counsel and seven days after his arraignment. Officers were aware at the time Conklin made his statement that he was represented by counsel, but did not contact his attorney. The Court described some of the pressures on the defendants as follows:

"Paintman was an admitted heroin addict with a $60 to $80 daily habit. He suffered withdrawal symptoms in the days preceding his statement. He was the target of derisive comments such as 'baby killer' from both inmates and jail personnel because one of his alleged victims was a young child. There also was testimony about Paintman's suicidal mood. Further * * * Paintman told jail personnel prior to making his statement that he didn't wish to talk with police. That desire was

answered by detectives appearing at the jail later in the day.

"Conklin was placed in a line-up the day after his arrest and spent most of his time in solitary confinement following his request for an attorney. He was taken out of the maximum security area after he confessed." *Id.,* 527-528.

Relying on *Edwards v Arizona,* 451 US 477; 101 S Ct 1880; 68 L Ed 2d 378 (1981), which had a fact situation similar to that in *Paintman,* the Court held Paintman's and Conklin's statements should have been suppressed since those statements were taken in violation of *Miranda.* In reaching this decision the Court cited the following passage from *Edwards:*

" '[A]n accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel *has been made available* to him, *unless the accused himself initiates* further communication, exchanges or conversations with the police.' *Id.* (Emphasis added.)" *Paintman, supra,* 525.

The *Paintman* Court went on to state:

"The *Edwards* Court emphasized, and we hold, that it is inconsistent with *Miranda* and its progeny for authorities to instigate a reinterrogation of an accused in custody who has clearly asserted the right to counsel. There is little doubt that both Paintman and Conklin clearly asserted their rights to counsel. In fact, their resistance to questioning continued unabated for a period of days.

"In Conklin's case, authorities were not only aware that he had requested counsel, but that counsel had been appointed and had filed an appearance. In Paintman's case, he first indicated his desire to speak with an attorney in response to a direct question by the chief

assistant prosecutor. The prosecutor then left, but police continued to talk with defendant.

"Of what significance is invocation of a cherished constitutional right if it is ignored by the hearer and, in fact, only seems to exacerbate the defendant's plight? As the time gap increases between the embracing of the right and its fulfillment, the certainty of its existence must surely dim." (Footnote deleted.) *Paintman, supra,* 529-530.

After carefully reviewing the facts of *Edwards* and *Paintman,* and the rationale for those decisions, we conclude that they do not require suppression of defendant's August 2, 1979, confession. We think there is an important distinction between asking for an attorney when questioned by police, as was the case in *Edwards* and *Paintman,*[3] and asking for appointment of an attorney at arraignment, as was the situation in the instant case. This difference was pointed out by the court in *Blasingame v Estelle,* 604 F2d 893, 895-896 (CA 5, 1979), where it stated:

"[S]ome defendants may well wish to have an attorney to represent them in legal proceedings, yet wish to assist the investigation by talking to an investigating officer without an attorney present. 'While the suspect has an absolute right to terminate station-house interrogation, he also has the prerogative to then and there answer questions, if that be his choice.' *Nash [v Estelle,* 597 F2d 513, 517 (CA 5, 1979)]. To hold that a request for appointment of an attorney at arraignment would bar an investigating officer from later finding out if

---

[3] We recognize that the defendants in *Paintman* asked for attorneys when questioned by police *and* at their arraignments. However, we view the reference to the request for appointment of counsel at arraignment as being a further indication that the defendants had clearly requested that they have counsel when dealing with the police. We do not view the reference to the fact that the defendants requested counsel at arraignment as standing for the principle that this request, alone, would bar the police from thereafter asking defendants if they wished to make any statements.

defendant wishes to exercise this prerogative would transform the *Miranda* safeguards, among which is the right to obtain appointed counsel, 'into wholly irrational obstacles and deprive suspects of an opportunity to make informed and intelligent assessments of their interests.' *Michigan v Mosley,* 423 US 96, 102; 96 S Ct 321, 326; 41 L Ed 2d 313 (1975).

"Therefore, we hold that the request for an attorney at arraignment does not prevent subsequent stationhouse interrogation where the request at arraignment is not made in such a way as to effectively exercise the right to preclude any subsequent interrogation."

In the instant case defendant never requested counsel when questioned by the police. He only requested appointment of counsel at his arraignment on the afternoon of August 1, 1979. However, this request for appointment of counsel was not made in such a way as to effectively exercise the right to preclude *any* subsequent interrogation. Rather, the circumstances surrounding defendant's request for counsel show it to have been unrelated to the Fifth Amendment right to confer with or have counsel present before answering any questions. *Blasingame, supra.* In this regard the instant case is distinguishable from *Paintman* and *Edwards.* Because of this crucial distinction, we conclude that the trial court did not err in not suppressing defendant's August 2, 1979, statement.

## II

*By warning a witness about the penalty for perjury, did the trial court deny defendant his right to due process and his right to confront witnesses?*

One of defendant's alleged coconspirators, Chare Knight, testified at defendant's preliminary exami-

nation. This testimony was given pursuant to a plea bargain. In return for Knight's preliminary examination testimony and a promise to testify at defendant's trial, Knight would be allowed to plead guilty to second-degree murder and the prosecutor would recommend a sentence of 10 to 15 years imprisonment. It was also agreed that should this deal "fall through" Knight's preliminary examination testimony would not be used against him at any subsequent prosecution.

Just before Knight was to testify at defendant's trial, the prosecution was informed, for the first time, that Knight would invoke his Fifth Amendment privilege against self-incrimination and that he would move to withdraw his guilty plea, which had, by that time, been entered. Informed of these events, the trial court ruled that Knight's preliminary examination testimony could be read to the jury since Knight was not available as a witness.

On the next day of trial, the court was informed that Knight had again changed his mind and would testify. Knight's change of mind was communicated to the trial court by his attorney. At this time, Knight's attorney informed the trial court that he could no longer ethically continue to represent Knight and, therefore, requested that he be allowed to withdraw.[4] At this point the trial court asked Knight if he wanted to waive his privilege against self-incrimination and testify. Knight responded affirmatively, and the trial court informed Knight that if he did testify anything he said could be used against him in a subsequent

---

[4] In *People v Collier*, 105 Mich App 46; 306 NW2d 387 (1981), we recognized that where defense counsel has prior knowledge that his client seeks to present perjured testimony, he may be required to withdraw from representing that client.

trial and that if he did not testify truthfully he could be subject to prosecution for perjury. After this colloquy Knight informed the trial court that he did not want to testify. Subsequently, Knight's preliminary examination testimony was read to the jury.

Relying primarily on *Webb v Texas,* 409 US 95; 93 S Ct 351; 34 L Ed 2d 330 (1972), defendant argues that his conviction must be set aside in that the trial court "threatened" Knight with perjury, drove him off the stand, and thereby denied defendant his right to confront and cross-examine a key witness.

Our review of the facts of *Webb* and the rationale for that decision lead us to conclude that no reversible error occurred in the instant case. The egregious harangue of the trial judge in *Webb,* which was obviously calculated to silence the defense witness, is not present in the instant case. Rather, here the trial judge's remarks were designed not only to protect the integrity of the trial process but also to protect the interest of the witness.

We wish to emphasize that where a witness is singled out by the trial judge (or, for that matter, by the prosecution) and threatened so that he is effectively driven off the witness stand, error will have occurred. See *Webb, supra,* and *People v Pena,* 383 Mich 402; 175 NW2d 767 (1970). However, as the Supreme Court's decision in *People v Wein,* 382 Mich 588; 171 NW2d 439 (1969), and this Court's decision in *People v Collier,* 105 Mich App 46; 306 NW2d 387 (1981), indicate, a criminal trial will not be allowed to become a game wherein the truth is concealed with the assistance

of the law. In the instant case, the trial judge, in light of the strong possibility of perjured testimony being given by Knight, was under a duty to ensure the proper administration of justice and to conduct the trial in such way that the discovery of the truth and the application of the law could occur unhindered. Under the facts of this case, no error occurred in the trial judge's remarks to Knight.

## III

*Was defendant denied his right to confront and cross-examine a prosecution witness by virtue of the fact that the witness had undergone hypnosis prior to trial?*

In the instant case, one prosecution witness testified that she had been hypnotized. However, she also stated that she had given a number of statements to the police prior to being hypnotized and that all the statements made at trial were made prior to the hypnotic session. Defense counsel was given the opportunity to cross-examine this witness about the tentativeness of her recollections and was given the opportunity (which was waived) to present expert testimony.

In *People v Gonzales,* 108 Mich App 145; 310 NW2d 306 (1981), *lv gtd* 412 Mich 870 (1981), this Court held that hypnosis has not received sufficient scientific recognition of reliability to allow the post-hypnotic recollections of witnesses to be introduced into evidence. However, this conclusion does not mean that a witness who has been hypnotized will automatically be barred from testifying. Rather, such a witness will still be allowed to testify as to those relevant facts remembered *prior*

to undergoing hypnosis, provided certain standards surrounding the hypnosis are met. *Gonzales, supra,* 159, fn 8. See also *People v Wallach,* 110 Mich App 37; 312 NW2d 387 (1981). In reaching this conclusion, the *Wallach* Court rejected the exclusion of all testimony by hypnotized witnesses on the basis that reliability and the credibility of the witnesses' testimony could be put in proper perspective through diligent cross-examination and through expert testimony as to the potential effect hypnosis might have on one's ability to recall events.

*Gonzales* was decided after the trial in the instant case. Therefore, the trial court did not have the benefit of that decision. Furthermore, it is impossible from the record to determine whether the standards for admission of testimony by a hypnotized witness had been met.

Although *Gonzales* did not address this issue, we find that the standards set forth in *Gonzales* have only prospective effect. For trials which occurred prior to the release date of *Gonzales,* or within 20 days after that decision was released, we hold that testimony concerning pre-hypnotic recollections is admissible to the extent that the trial court is left with a belief that the witness's testimony actually was remembered prior to the hypnosis. Applying this standard to the instant case, we find that the trial court justifiably could have concluded that the witness's testimony was limited to pre-hypnotic recollections.

In any case, even assuming *arguendo* that the complained-of testimony was incorrectly admitted, reversible error did not occur. Any error that did occur in the admission of the complained-of testi-

mony was harmless in light of the overwhelming evidence against defendant.

## IV

*Did the trial court's instructions on reasonable doubt constitute reversible error?*

Citing *People v Davies,* 34 Mich App 19; 190 NW2d 694 (1971), as well as other cases, defendant argues that the trial court erroneously instructed the jury on the issue of reasonable doubt. Defendant further contends that this instruction shifted the burden of proof.

The error in *Davies* was charging the jury that a reasonable doubt could not be based upon a lack of evidence or upon the unsatisfactory nature of the evidence. *People v Smalls,* 61 Mich App 53; 232 NW2d 298 (1975), *People v Ames,* 60 Mich App 168; 230 NW2d 360 (1975). No such instruction was given in the instant case.

Reading the jury instructions as a whole we find that defendant's assignments of error are without merit.

## V

*Must defendant's conviction for conspiracy to commit second-degree murder be set aside because there is no offense known in law as conspiracy to commit second-degree murder?*

Without objection, the jury was instructed, *inter alia,* that defendant could be found guilty of conspiracy to commit murder in the first degree (as was charged in the information) or conspiracy to commit murder in the second degree. On appeal,

defendant argues that this instruction was errone-
ous in that there is no such crime as conspiracy to
commit second-degree murder. The gist of defen-
dant's argument on appeal is that the crime of
conspiracy involves an agreement between two or
more persons to accomplish some criminal act.
Since it is the absence of premeditation and delib-
eration which distinguishes second-degree murder
from first-degree murder, defendant argues that it
is impossible for a jury to find that defendant
engaged in the premeditated commission of a
crime which must be accomplished without pre-
meditation.

We agree with defendant's conclusion and, while
we generally will not address error purported
upon instructions to which no objections were
raised, we will consider this issue in order to
prevent the occurrence of manifest injustice. See
*People v Lytal,* 96 Mich App 140, 163; 292 NW2d
498 (1980), *lv gtd* 409 Mich 923 (1980).

Generally speaking, a criminal conspiracy is a
mutual understanding or agreement between two
or more persons, express or implied, to do or
accomplish some criminal or unlawful act. *People
v Atley,* 392 Mich 298, 311; 220 NW2d 465 (1974).
The requisite elements of the crime of conspiracy
are met when the parties enter into the mutual
agreement; no overt acts must be established.
*People v Scotts,* 80 Mich App 1, 14; 263 NW2d 272
(1977). As a crime, conspiracy is separate and
distinct from the substantive offense. *People v
Carter,* 94 Mich App 501, 504-505; 290 NW2d 46
(1979). The statute on the crime of conspiracy
punishes the "planning" of the substantive offense;
the statute on the substantive offense punishes the
actual commission of the crime. *People v Hamp,*

110 Mich App 92; 312 NW2d 175 (1981). Thus, in order to prove conspiracy to commit murder it is not necessary to prove that a murder actually occurred. However, it must be established that the conspirators had the specific intent to commit murder. *People v Boose,* 109 Mich App 455, 470; 311 NW2d 390 (1981).

It is the separate nature of the crime of conspiracy from the substantive offense which recently led this Court in *Hamp, supra,* 103, to conclude the crime of conspiracy to commit second-degree murder is not a necessarily included lesser offense of the crime of conspiracy to commit first-degree murder. In reaching this conclusion the Court reasoned:

> "Since prior 'planning' and 'agreement' are necessary, mandatory requisite elements of the crime of conspiracy, we find it analytically consistent to 'plan' to commit first-degree murder but logically inconsistent to 'plan' to commit second-degree murder. To prove a conspiracy to commit murder, it must be established that each of the conspirators have the intent required for murder and, to establish that intent, there must be foreknowledge of that intent. Foreknowledge and plan are compatible with the substantive crime of first-degree murder as both the crime of conspiracy and the crime of first-degree murder share elements of deliberation and premeditation. Prior planning denotes premeditation and deliberation. The elements of conspiracy, conversely, are incompatible and inconsistent with second-degree murder. One does not 'plan' to commit an 'unplanned' substantive crime. It is not 'absence' of the elements but the 'inconsistency' of the elements which lead us to conclude that one conspires to commit first-degree murder but not second-degree murder."

Although *Hamp* did not specifically hold that

the crime of conspiracy to commit second-degree murder is nonexistent, the rationale of that opinion leads us to such a conclusion. As did the panel in *Hamp,* we find the elements of conspiracy to be incompatible and inconsistent with the elements of second-degree murder. One does not plan to commit an unplanned substantive offense.

Approaching the issue from a somewhat different perspective, we also conclude that an agreement to assault could never be elevated to conspiracy to commit second-degree murder—even where the assault does, in fact, result in the death of the victim. Where there is an agreement to assault, the conspiracy would be complete before any overt act occurred. If the assault resulted in an "unplanned" death, the conspirators could be found guilty of conspiracy to assault and of the substantive crime of second-degree murder where the requisite malice arose from the assault and the resultant death. This result is consistent with the following illustration:

"[T]he fact that conspiracy requires an intent to achieve a certain objective means that individuals who have together committed a certain crime have not necessarily participated in a conspiracy to commit that crime. To take the example given by the Model Penal Code draftsmen, assume that two persons plan to destroy a building by detonating a bomb, though they know and believe that there are inhabitants in the building who will be killed by the explosion. If they do destroy the building and persons are killed, they are guilty of murder, but this is because murder may be committed other than with an intent-to-kill mental state. Their plan constitutes a conspiracy to destroy the building, but not a conspiracy to kill the inhabitants, for they did not intend the latter result." (Footnotes omitted.) LaFave & Scott, Handbook on Criminal Law (1972), pp 465-466.

In light of the above, defendant in the instant case could not have been found guilty of conspiracy to commit second-degree murder. If the defendant had agreed with his coconspirators to murder, the completed conspiracy crime would have been conspiracy to commit murder in the first degree because of the planning and premeditation involved. On the other hand, if defendant had agreed with his coconspirators to assault his victim, and the conspirators did not intend for the victim to die, even though death did in fact result, the conspiracy crime would have involved some sort of assault offense which would have been completed before the victim's death occurred.[5]

For the foregoing reasons, defendant's conviction of conspiracy to commit second-degree murder is vacated. Defendant's conviction of second-degree murder is affirmed as is his sentence.

Affirmed in part; reversed in part.

Bronson, J., concurred.

J. H. Gillis, J. *(concurring in part; dissenting in part)*. I agree with parts I through IV of the majority opinion. However, as to part V I must dissent. The majority holds that defendant cannot be convicted of conspiracy to commit second-degree murder because conviction of such crime would be in itself logically inconsistent.

Defendant was not charged with conspiracy to commit second-degree murder. He was charged

---

[5] Where the particular facts of a case make it unclear as to the intent of the conspirators, we think a prosecutor would be justified in filing and bringing a defendant to trial under a multi-count information. See *People v Jankowski,* 408 Mich 79, 92-93; 289 NW2d 674 (1980). Thus, a conspirator might be charged with one count of conspiracy to commit murder and one count of conspiracy to commit some type of assaultive offense. It would then be for the jury to determine which, if any, offense had been committed.

with conspiracy to commit first-degree murder. The second-degree murder conspiracy instruction was given apparently in order to comply with *People v Jenkins,* 395 Mich 440; 236 NW2d 503 (1975). In *Jenkins,* the Michigan Supreme Court held that in every case in which first-degree murder is charged, the trial court must instruct the jury *sua sponte,* and even over objection, on second-degree murder.

In the case at bar no objection to the instruction was proffered by defendant. A verdict of guilty of conspiracy to commit second-degree murder was returned by the jury.

Juries are not held to any rules of logic. The Michigan Supreme Court has held that juries are free to render verdicts which are inconsistent. *People v Vaughn,* 409 Mich 463; 295 NW2d 354 (1980). This rule preserves the jury's power to dispense mercy. *Id.,* 466. In light of this rule, coupled with defendant's failure to object to the instruction, I would affirm the conviction.