852 F.2d 568
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Mildred PERRY, Petitioner-Appellant,
v.
Carol HOWES, Warden, Respondent-Appellee.
 No. 86-2131.
 United States Court of Appeals, Sixth Circuit.
 July 19, 1988.
 
 Before BOYCE F. MARTIN, Jr., WELLFORD and DAVID A. NELSON, Circuit Judges.
 PER CURIAM.
 
 
 1
 Imprisoned by the State of Michigan on a conviction for the second-degree murder of her husband, petitioner applied for federal habeas corpus relief. The district court declined to issue the writ, and petitioner has appealed. We shall affirm the judgment of the district court.
 
 
 2
 * The petitioner, Mildred Perry, was sentenced to two concurrent terms of life imprisonment after a Wayne County Circuit Court jury found her guilty of murder in the second-degree and conspiracy to commit second-degree murder. Petitioner and the alleged triggerman, Robert Jackson, were tried together before different juries.
 
 
 3
 The testimony at trial showed that petitioner's husband had been seeing another woman. Distraught over her husband's affair, petitioner called the other woman, Claire Miller, and asked her if she knew "that in the Detroit area for six hundred dollars or less you can have anyone eliminated that you want." In a later conversation petitioner told Ms. Miller that she couldn't "stand the humiliation of a second divorce" and "would rather see [her husband] dead than with another woman." Ms. Miller testified that she and Mr. Perry had been planning to start a vacation together in Baltimore shortly before Mr. Perry was shot. There was evidence that petitioner had met with Mr. Jackson and another man the day before the shooting.
 
 
 4
 There were two witnesses whose testimony figures prominently in the petitioner's assignments of error here. The first, Mr. Chare Knight (also called Charles Knight), had been indicted for first-degree murder. Mr. Knight agreed to testify at a preliminary hearing and at the trial of petitioner and Mr. Jackson in exchange for being allowed to plead guilty to a reduced charge of second-degree murder.
 
 
 5
 At the preliminary examination Mr. Knight testified that petitioner had contacted him about arranging the murder of her husband. Knight said that he and Jackson met with petitioner on at least two occasions, and once drove past the Perry home to show Jackson where it was. Mr. Knight also testified that Robert Jackson later told him he had murdered petitioner's husband and received payment from petitioner for doing so.
 
 
 6
 Mr. Knight repudiated his plea bargain before petitioner's trial and indicated a willingness to testify on behalf of petitioner and Mr. Jackson. When Mr. Knight's attorney informed the Circuit Court of his client's change of heart, the court warned Knight about the dangers of committing perjury. Knight then declined to testify, asserting his privilege under the Fifth Amendment. Finding that Mr. Knight was "unavailable" under the Michigan Rules of Evidence, the court allowed the jury to hear the transcript of the testimony given by Mr. Knight at the preliminary examination.
 
 
 7
 Mr. Knight's testimony was read to the jury twice, once during the presentation of the state's evidence and once after the jury had retired to deliberate. After beginning its deliberations the jury asked the trial judge for permission to have the testimony of several witnesses read back, including the testimony of petitioner and of Mr. Knight. The judge advised the jury of the difficulties involved in having testimony reread, and told the jurors to reconsider their request. After conferring further the jury asked that only the transcript of the Chare Knight testimony be reread.
 
 
 8
 The judge agreed. Unfortunately, the judge and petitioner's counsel were absent from the courtroom while Mr. Knight's testimony was being repeated. As agreed by petitioner's attorney, an investigator who worked with the attorney was present, as was petitioner herself.
 
 
 9
 The second witness with whom we must concern ourselves was petitioner's niece, Christine Brandon. Ms. Brandon testified that approximately four months before she took the stand she had been hypnotized at the instance of the prosecutor to help refresh her memory. The defendants had been provided with two transcripts of statements that Ms. Brandon had given the police prior to undergoing hypnosis. Defense counsel could not show any material inconsistencies between Ms. Brandon's testimony at trial and the statements she gave before being hypnotized.
 
 
 10
 Ms. Brandon's testimony dealt with conversations she had had with her aunt and with an individual identified as "Charles." Prior to the murder petitioner had spoken to her niece several times about her marital difficulties and about consultations with a spiritualist known as "Mother Mary" or "Reverend Mary." Acting upon advice from Mother Mary, as petitioner was said to have told Ms. Brandon, petitioner had sprinkled some of her husband's urine on his food and had written his name seven times on a piece of paper which she put in her shoe. Mother Mary was supposed to have recommended these actions to petitioner as means of winning back her husband's affections. Also at Mother Mary's suggestion, petitioner told Ms. Brandon, petitioner arranged to have her husband beaten up.
 
 
 11
 A few days before the murder, Ms. Brandon testified, she received a call from petitioner. "She said that she had found someone to beat up Elwood [her husband]. She said it took'em all day long. They drove all day long to find someone to beat him up, and that no one would suspect it because they would drive a big luxury car." The night before the murder, according to Ms. Brandon, petitioner called Ms. Brandon to see if Elwood was with her. Ms. Brandon said he was not. A few hours later Ms. Brandon called petitioner back. Ms. Brandon "asked her if Elwood had gotten there, and she said yes, he is here, and really couldn't talk and she hung up." The next morning Ms. Brandon received a call from petitioner informing her that Mr. Perry had been killed. In subsequent conversations with her aunt, after the police investigation of the murder was underway, Ms. Brandon said she was told "not to talk to Sergeant Ericson, he was just out to hang her neck."
 
 
 12
 Once when Ms. Brandon was at her aunt's house she answered the phone and an individual who identified himself as "Charles" asked to speak with Mrs. Perry. Petitioner "flagg[ed] her hands back" indicating that "[s]he didn't want to talk." Ms. Brandon told the caller that Mrs. Perry "has had a bad day and she really don't feel like coming to the phone," to which the caller replied "if she can play that way, I can too." Ms. Brandon testified that petitioner then "panicked and said that we had to get out of here." Thereafter "Charles" began calling and menacing Ms. Brandon at her home in his attempts to reach Mrs. Perry. Frightened by the calls, Ms. Brandon turned to the police and gave them the number Charles had given her.
 
 
 13
 Petitioner took the stand in her own defense. She contended that she never arranged to have her husband killed, and although she did have him beaten up, this was only intended to "humble" him. Petitioner maintained that she had no advance knowledge of her husband's assailants breaking into the house. Only after she was awakened by the gunshots, she said, did a person appear in her bedroom and demand money. She testified that she left some money on a chair before running into her husband's bedroom, where she found him bleeding. Because the telephone had been "pulled to the side," she went to her neighbor's house to call the police.
 
 
 14
 The remaining evidence is not directly pertinent here, but after hearing all the evidence the jury found petitioner guilty of both second-degree murder and conspiracy to commit the murder. Petitioner appealed her convictions to a Michigan Court of Appeals. That court vacated the conviction for conspiracy on the ground that it is impossible to conspire to commit murder in the second-degree, but the murder conviction itself was upheld. People v. Perry, 115 Mich.App. 533, 321 N.W.2d 719 (1982); People v. Jackson, 114 Mich.App. 649, 667, 319 N.W.2d 613, 620 (1980), rev'd sub nom. People v. Bladel, 421 Mich. 39 (1984), aff'd sub nom. Michigan v. Jackson, 475 U.S. 625 (1986).
 
 
 15
 In subsequent state appellate proceedings the Supreme Court of Michigan twice directed the Court of Appeals to reconsider the propriety of admitting Ms. Brandon's hypnotically-refreshed testimony. People v. Perry, 417 Mich. 908, 330 N.W.2d 852 (1983), 422 Mich. 882, 367 N.W.2d 68 (1985). Each time the Court of Appeals affirmed the conviction, holding (a) that Ms. Brandon's hypnotically refreshed testimony was reliable because it was consistent with her statements prior to hypnosis, and (b) that even if the consistency failed to establish reliability, introduction of the testimony was harmless error because it was cumulative to other testimony presented at trial. People v. Perry, 126 Mich.App. 86, 337 N.W.2d 324 (1983); 144 Mich.App. 420; 375 N.W.2d 10 (1985). Petitioner sought review in the Michigan Supreme Court a third time, but leave to appeal was denied. Petitioner then brought the present federal action for a writ of habeas corpus. The district court denied the writ. On appeal petitioner advances ten arguments as to why the district court erred.
 
 II
 
 16
 Half of petitioner's arguments concern the testimony of Chare Knight, as given at the preliminary examination and subsequently read to the jury at petitioner's trial. The first assignment of error relates to the fact that the court reporter did not actually transcribe the reading of the preliminary examination transcript, but simply relied on the original transcript.
 
 
 17
 The Michigan Court of Appeals described this issue, and disposed of it, as follows: "[D]efendant's contention that a determination cannot be made from the trial transcript as to which portions of the preliminary examination testimony was read at trial is without merit." Perry, supra, 321 N.W.2d at 721. Its review of the trial transcript led the court of appeals "to conclude that the entire preliminary examination testimony of Chare Knight was read to the jury." Id. While commenting that "the better practice may have been to re-transcribe the preliminary examination testimony as it was read at the trial," the court could not "say that reversible error occurred because this was not done." Id. The court also noted that "a strong argument could be made that defense counsel waived re-recording by the court reporter of the preliminary examination testimony since the parties obviously had to be aware that the court reporter was not recording the preliminary examination testimony." Id.
 
 
 18
 We find no flaw in the Michigan court's decision on this point. A defendant has no constitutional right to a verbatim transcript. If an opportunity to obtain appellate review is mandatory, all that is required is a record of "sufficient completeness" to allow presentation of the appellant's claims. Schwander v. Blackburn, 750 F.2d 494, 497-8 (5th Cir.1985). Having read the trial court's direction on the reading of the preliminary examination transcript, we conclude that almost all of the transcript was read to the jury. It is possible that a certain colloquy between attorneys was omitted, see Perry, supra, 321 N.W.2d at 721 n. 1, but there could have been no prejudice to petitioner whether or not the colloquy was read.
 
 III
 
 19
 Petitioner's second argument is that the re-reading of Chare Knight's preliminary examination testimony to the jury in the absence of the judge and petitioner's attorney and without a court reporter being present constituted a denial of due process.
 
 
 20
 It is not acceptable practice for the judge to be absent when any evidence is being read or submitted to the jury. Under the totality of the circumstances presented here, however, and in the absence of any demonstration of prejudice to petitioner, the error did not fatally taint the trial.
 
 
 21
 As to the absence of petitioner's attorney, this court has held:
 
 
 22
 "Where the Sixth Amendment claim is the denial, rather than the ineffective assistance, of counsel, the criminal defendant need only show that counsel was absent during a critical stage of the proceedings in order to establish the constitutional violation. Absence from the proceedings is deficient performance as a matter of law, and prejudice is presumed."
 
 
 23
 Green v. Arn, 809 F.2d 1257, 1263 (6th Cir.), vacated on other grounds, 108 S.Ct. 52 (1987), reinstated 839 F.2d 300 (6th Cir.1988). The relevant inquiry, then, is whether petitioner's counsel left her during a "critical" stage in her trial.
 
 
 24
 In Green, we held that counsel's absence during the cross-examination of a prosecution witness was prejudicial per se and that therefore harmless error analysis was inapplicable. We also noted that "some absences by a criminal defendant's attorney might be so de minimis that there would be no constitutional significance." 809 F.2d at 1261. Suggested circumstances to which harmless error analysis would be appropriate were preliminary hearings, jury deliberations, and return of the verdict.
 
 
 25
 In the case at bar it does not seem to us that the rereading of transcribed testimony to the jury after the submission of the case for deliberation represented a critical stage in petitioner's trial. Although she and a representative of her attorney were both present in the courtroom while the prosecutor reread Knight's testimony, petitioner has not suggested that anyone in the courtroom did anything improper. She has not demonstrated any prejudice whatever, and the harmless error rule therefore controls this branch of petitioner's case.
 
 IV
 
 26
 Petitioner's third assignment of error relates to the jury's request that the testimony of five witnesses, including petitioner, be reread. The judge told the jurors that the reporter's notes had not been transcribed and it would take some four days to recreate what was said. He nevertheless advised the jury that
 
 
 27
 "[i]f you absolutely have to have it, we could do that, but I would ask you to continue your deliberations. * * * As I say, if you get into it, it is four days ... that you would sitting, listening to testimony being read back, so I would ask that before we do that, you see that if among the twelve of you discussing the testimony you can conclude what was said. If after a day or so you find you can't, then you make your request again and we will make the necessary arrangements to read the testimony to you. I remind you that you will be listening about three and a half to four days, but you may have if after you have talked some more among yourselves you absolutely need it. Send me another note on it and we will proceed."
 
 
 28
 On the following day the jury sent the judge a note asking that only the testimony of Chare Knight be reread.
 
 
 29
 Petitioner claims that it was improper to reread Mr. Knight's testimony alone, because the "most damaging testimony was not balanced by the re-reading of the testimony of the defendant, that which the jury had asked for on the previous day." The judge has broad discretion as to the rereading of trial testimony, however, United States v. Toney, 440 F.2d 590, 592 (6th Cir.1971); United States v. Licavoli, 725 F.2d 1040, 1049 (6th Cir.), cert. denied sub nom., Calandra v. United States, 467 U.S. 1252 (1984), and there was no abuse of discretion amounting to constitutional error here.
 
 V
 
 30
 Petitioner's fourth assignment of error concerns a portion of Chare Knight's preliminary examination testimony dealing with what Robert Jackson said after the crime. Knight testified that Jackson told him that he and a partner had gained entry to the Perrys' house by prying open a garage door, after which Jackson shot and killed Mr. Perry. The intruders then went to Mrs. Perry's bedroom and got some money from her before leaving.
 
 
 31
 Petitioner's attorney had originally objected to this testimony as hearsay. The objection was sustained at the preliminary examination, but the offending testimony was nevertheless read to the jury at the time of trial. Petitioner claims that this violated her Sixth Amendment right to confront Robert Jackson.
 
 
 32
 Petitioner's argument must fail for two reasons. At trial her attorney failed to object to the reading of this portion of the transcript. The Michigan Court of Appeals therefore declined to address the issue on the merits, and there has been no showing of "cause and prejudice" that would allow us to reach the merits under the rule of Wainwright v. Sykes, 433 U.S. 72 (1977).
 
 
 33
 Second, petitioner would not prevail even if we could reach the merits. Ohio v. Roberts, 448 U.S. 56 (1980), teaches that the introduction of hearsay does not violate the Confrontation Clause of the Constitution if it can be shown that the declarant is unavailable and that the hearsay has sufficient indicia of reliability to comport with the "substance of the constitutional protection." 448 U.S. at 66 (quoting Mattox v. United States, 156 U.S. 237, 244 (1895)). The record before us indicates that Robert Jackson, the declarant, was unavailable to testify at petitioner's trial because he himself was being prosecuted and he declined to take the stand. His declarations were statements against interest, and this was a sufficient indicium of reliability to pass constitutional muster.
 
 VI
 
 34
 Petitioner's fifth assignment of error rests on a claim that the trial court coerced Chare Knight into declining to testify by threatening to charge him with perjury should his testimony prove to be false. As noted earlier, Mr. Knight had entered into a plea bargain under which he was to testify at the preliminary examination and at petitioner's trial. Prior to the trial Knight withdrew his plea of guilty and asserted his Fifth Amendment right to remain silent. Knight subsequently indicated that although his attorney advised against it, he would testify at petitioner's trial. Before the judge allowed Knight to testify, he made sure that Knight understood that anything he said could be used against him in his own trial and that he could be prosecuted for perjury if he did not testify truthfully. Mr. Knight then decided not to testify.
 
 
 35
 Petitioner contends that the judge's warnings to Knight violated her due process rights as defined by Webb v. Texas, 409 U.S. 95 (1972). When the defendant in Webb called his only witness, a convict with a prior criminal record, the judge, on his own initiative, undertook to admonish the witness that if he lied on the stand he would be subject to perjury charges and his chances for parole would be jeopardized. After the judge made his comments, the witness decided not to testify. The Supreme Court held that it was a denial of due process for the trial judge gratuitously to single out this witness for a lengthy admonition on the dangers of perjury.
 
 
 36
 Petitioner's case is readily distinguishable from Webb. Here the judge had every reason to warn Knight about the dangers of committing perjury. The fact that Knight had withdrawn from his plea bargain and was probably getting ready to contradict his preliminary examination testimony made it incumbent upon the judge to make sure Knight understood the predicament he was in--especially when Knight's own attorney did not want him to testify.
 
 VII
 
 37
 Petitioner's sixth assignment of error concerns the admission of the hypnotically-refreshed testimony of the niece, Ms. Brandon. The petitioner argues that under hypnosis a witness is susceptible to suggestion from the prosecution. Furthermore, by bringing to the jury's attention that Ms. Brandon had undergone hypnosis, the prosecution is said to have bolstered her credibility improperly.
 
 
 38
 Rulings by a state court on the admissability of evidence are not normally reviewable in federal habeas proceedings unless "fundamental fairness" has been impugned. Burks v. Egeler, 512 F.2d 221, 223 (6th Cir.1975), cert. denied 423 U.S. 937 (1975). The admission of the post-hypnosis testimony here cannot be said to have impugned fundamental fairness. See Rock v. Arkansas, 483 U.S. ----, 97 L.Ed.2d 37 (1987), where the Supreme Court held a state rule excluding all post-hypnosis testimony impermissibly infringed on the right of a defendant who had undergone hypnosis to testify on her own behalf. In arriving at its conclusion the Supreme Court noted that it is often possible to minimize the dangers of hypnotically-refreshed testimony:
 
 
 39
 "Certain information recalled as a result of hypnosis may be verified as highly accurate by corroborating evidence. Cross-examination, even in the face of a confident defendant, is an effective tool for revealing inconsistencies. Moreover, a jury can be educated to the risks of hypnosis through expert testimony and cautionary instructions." 97 L.Ed.2d at 52.
 
 
 40
 Petitioner's counsel was able to cross-examine Ms. Brandon in our case. The witness' testimony was corroborated by other evidence, and as the Michigan Court of Appeals noted, her post-hypnosis testimony did not vary significantly from her pre-hypnosis testimony. The hypnotist was present at the trial, and petitioner thus had an opportunity to call him as a witness. There is no contention that any cautionary instructions requested by the petitioner were not given to the jury. The danger that the jury was seriously misled here does not seem excessive.
 
 VIII
 
 41
 Petitioner's seventh claim of error is premised on an allegation that the jury was given an erroneous definition of malice. The trial court instructed the jury that "[m]alice means that the defendant intended to kill or that she knowingly created a very high risk of death with knowledge that it probably would result in death and that she did so under circumstances which would not justify, excuse, or lessen the crime." Noting that in People v. Aaron, 409 Mich. 672, 728 (1980), the Supreme Court of Michigan stated that malice is "the wanton and willful disregard of the likelihood that the natural tendency of defendant's behavior is to cause death or great bodily harm," petitioner argues that the instruction given at her trial was not only erroneous but a due process violation under In re Winship, 397 U.S. 358 (1970). We are not persuaded. "A federal court is not free to issue a writ of habeas corpus 'on the basis of a perceived error of state law,' " Smith v. Sowders, 86-6117 (6th Cir. June 8, 1988) (quoting Pulley v. Harris, 465 U.S. 37, 41 (1984)), and even if we perceived an error of state law--which we do not--the fact remains that petitioner's counsel never objected to the instruction in question. If the instruction was erroneous, moreover, the error was not of constitutional magnitude.
 
 IX
 
 42
 Petitioner's eighth assignment of error relates to her conviction of conspiracy to commit second-degree murder. That assignment of error is moot since the Michigan Court of Appeals has vacated the conspiracy conviction.
 
 X
 
 43
 Petitioner's ninth assignment of error is based on the assertion that during closing argument the prosecutor vouched for the credibility of prosecution witnesses, testified to matters not in the record, and suggested that a prosecution witness feared retribution at the hands of the defendant.
 
 
 44
 In Cook v. Bordenkircher, 602 F.2d 117, 119 (6th Cir.) cert. denied, 444 U.S. 936 (1979), this court held that to warrant habeas relief "[p]rosecutorial argument must be so egregious so as to render the entire trial fundamentally unfair." In Cook, a "persistent ad hominem attack on the petitioner's character ... pervade[d] the closing argument."
 
 
 45
 "The prosecutor continually portrayed petitioner as a low life who had to be kept from society. In a moment of eloquence rivaled only by a fire and brimstone orator, the prosecutor exclaimed that the petitioner was worse than all of the 'criminals' and 'traitors' in hell. A central theme of the prosecutor's argument was that the petitioner, who had been previously convicted of forgery and grand larceny, was trying to 'forge' and 'steal' justice by 'conning' the jury with a made-up story." Id. at 119-120."
 
 
 46
 Although we observed that "[t]aken as a whole, this closing argument was clearly improper," we nevertheless held that the petitioner was not deprived of a fair trial. The statements of which petitioner complains here were far less outrageous than those in Cook, and we do not believe that they deprived petitioner of a fair trial.
 
 XI
 
 47
 Petitioner's last argument is that she is entitled to relief because of the supposed ineffectiveness of her counsel at trial. Under Strickland v. Washington, 466 U.S. 668, 687-691 (1984), this argument clearly has no merit.
 
 
 48
 The judgment of the district court is AFFIRMED.