STATE of North Dakota, Plaintiff and Appellee,

v.

Larry Henry SCHLICKENMAYER, Defendant and Appellant.

Crim. No. 874.

Supreme Court of North Dakota.

May 12, 1983.

Ralph A. Vinje, Bismarck, for defendant and appellant.

Rolf P. Sletten, Sp. Asst. State's Atty., Bismarck, for plaintiff and appellee.

PAULSON, Justice

Larry Henry Schlickenmayer [Schlickenmayer] appeals from a judgment of conviction entered in the District Court of Burleigh County on June 24, 1982, upon a jury's verdict finding him guilty of the crime of negligent homicide. We affirm.

In a criminal information dated February 10, 1982, Schlickenmayer was charged with the offense of manslaughter, under § 12.1–16–02(1) of the North Dakota Century Code, by recklessly causing the death of Viola Karas [Karas]. Karas's frozen body was discovered at approximately 6:45 a.m. on February 2, 1982, lying on Highway 1804 several miles northwest of Bismarck.[1]

The record of the trial proceedings reveals that on the evening of February 1, 1982, Schlickenmayer met Karas and another woman at the Paper Dollar Bar in Bismarck. He bought each of the women a beer and then they went to the Covered Wagon Bar, also in Bismarck, where Schlickenmayer once again bought drinks for himself and the two women. After the other woman left the bar, Schlickenmayer asked Karas to go dancing. Schlickenmayer took Karas to her home where she changed clothes, and they then proceeded to the Longhorn Bar & Lounge in Bismarck where they each had another beer.

After they left the Longhorn Bar, Schlickenmayer and Karas decided to go dancing at a bar in Washburn. Schlickenmayer testified that on the way to Washburn, by way of "River Road" and Highway 1804, he stopped his car to get a bottle of vodka out of the car's trunk. He testified that during the drive they had about four drinks out of the bottle and that Karas was "hugging and kissing on me all the way". Schlickenmayer further testified that at a point about 21 miles northwest of Bismarck, he pulled his car to the side of the road because he "just couldn't take it any more" and the couple engaged in an act of sexual intercourse.

Schlickenmayer stated that he then crawled into the back seat of the car and fell asleep for three or four hours. He stated that he awoke shortly before 3 a.m. and, because it was too late to go to a bar, they decided to return to Bismarck. According to Schlickenmayer, they drank some more vodka and then Karas began scratching his arm and neck with her fingernails. Schlickenmayer testified that when she refused to stop scratching him, he told her: "Knock it off or I will stop the car and put you out". He stated that she continued scratching him, so he pulled the car to the side of the road, opened the passenger door, "and she just grabbed her stuff and she got out of the car and slammed the door". He testified that Karas was fully dressed when she left the car at a point he estimated to be near mile marker 97 on the highway. Schlickenmayer stated that he then drove to Bismarck, arriving home at approximately 3:30 a.m. He did not attempt to inform anyone about Karas's whereabouts at that time, he later told police, because he was "mad" that she had scratched him.

The evidence established that at the time Schlickenmayer left Karas on the highway, the temperature was two degrees Fahrenheit and the wind chill factor[2] was nine degrees below zero. The evidence further indicated that the temperature was falling, that the wind was rising, and that by 7 a.m. the temperature was minus eight degrees Fahrenheit and the wind chill factor was forty degrees below zero.

Karas's body was found near mile marker 89, almost eight miles from the point at which Schlickenmayer testified that she had left his car. Karas's purse, pants, shoes,

1. The precise time of death is uncertain. The testimony of the persons who found Karas lying on the highway at about 6:45 a.m. indicates that she might have been alive at that time, so they covered her up with numerous blankets and articles of clothing. An officer of the North Dakota State Highway Patrol who arrived at the scene at approximately 7:30 a.m. testified that he could find no pulse when he checked the body. The "Certificate of Death" lists the hour of death as approximately 6 a.m.

2. Donald Stoltz of the National Weather Service in Bismarck testified that "Wind chill represents how fast a body would lose heat due to the wind and combination of the wind and temperature". When asked to compare the temperatures in the area around "Double Ditch", the area where the body was found, and the Bismarck Airport, where the temperatures were recorded, he stated that the "Double Ditch" area would have been slightly colder "because of the cold air drainage down towards the [Missouri] river basin".

and some personal items were found at various points north of where her body was found, and her hat and vest were discovered in the roadside ditch at points nearer to Bismarck than the point at which her body was found. An autopsy revealed that Karas died of hypothermia and that she had a blood alcohol content of 0.23 percent.

During the trial, the State took the position that Karas walked and crawled the eight miles from the point at which Schlickenmayer testified he let her out of the car to the point at which her body was found. The State also argued that some of Karas's clothing was found closer to Bismarck than the body was found because Schlickenmayer threw them out of his car on the way home so that his wife would not discover that he had been out with another woman. Schlickenmayer, on the other hand, took the position that, because Karas was a 54-year-old woman, and because of her state of intoxication and the extremely adverse weather conditions present at the time, she was unable to walk or crawl the eight-mile stretch of the highway and that, therefore, a third party must have subsequently picked Karas up and then thrown her out on the road. Schlickenmayer also argued in the alternative that Karas, in a sense, was the major cause of her own death because of her actions in the car and because she did not seek refuge at several sources of shelter he contends were available along the eight miles of highway she traveled after being put out of his car.

On May 5, 1982, the jury returned a verdict finding Schlickenmayer guilty of the lesser included offense of negligent homicide under § 12.1–16–03, N.D.C.C. Schlickenmayer was sentenced to serve five years in the North Dakota State Penitentiary with credit for six days served in the Burleigh County Jail.

In his appeal, Schlickenmayer alleges that error occurred during the trial proceedings because the trial court failed to instruct the jury regarding "cause", because the trial court allowed the State to introduce in evidence a video tape of the eight-mile route of highway Karas traveled, and because the trial court denied the defendant's request for a jury view of the route Karas traveled.

## I

## JURY INSTRUCTIONS

Schlickenmayer's first argument is that the trial court erred in not instructing the jury as to the definition of the term "cause." We initially note that although Schlickenmayer objected to the inclusion of the instruction on the lesser included offense of negligent homicide, at no time did he either request that the jury be instructed as to the definition of "cause" or object to the lack of such an instruction.

In *State v. Motsko,* 261 N.W.2d 860, 866 (N.D.1977), our court held that words of common understanding need not be defined by the trial court in the absence of a specific request for such an instruction, "in which case the court should exercise an appropriate discretion in deciding whether definitions are necessary". *See also State v. North Dakota Ed. Ass'n,* 262 N.W.2d 731, 734 (N.D.1978). We conclude that the word "cause" is a common one, readily understood, and as such it need not be defined, particularly in the absence of a request for definition. *See People v. Plummer,* 37 Mich.App. 657, 195 N.W.2d 328, 331 (1972) [no error in court's refusal to give defendant's requested definition of "efficient cause" because the term is not complicated and is susceptible of ordinary comprehension]. *See also People v. Carlson,* 79 Ill.2d 564, 38 Ill.Dec. 809, 818, 404 N.E.2d 233, 242 (1980) [failure of court to *sua sponte* give definitional instruction on "recklessly" was not error]; *State v. Jones,* 300 N.C. 363, 266 S.E.2d 586, 587 (1980) ["intent" is self-explanatory, and the court's failure to define the word was not error]. Therefore, the court's failure in the instant case to define the word "cause", particularly in the absence of a request to do so, was not error.

## II

## VIDEO TAPE

Schlickenmayer next contends that the trial court erred in allowing the State to

introduce a video tape taken of the eight-mile stretch of highway Karas walked on February 2, 1982, because the video tape was "inaccurate and highly prejudicial".

■■ Our court has held in the past that the use and admission of photographs in criminal trials is largely within the discretion of the trial court. *State v. Engel,* 289 N.W.2d 204, 209 (N.D.1980); *State v. Heasley,* 196 N.W.2d 896, 906 (N.D.1972); *State v. Iverson,* 187 N.W.2d 1, 37 (N.D.), *cert. denied,* 404 U.S. 956, 92 S.Ct. 322, 30 L.Ed.2d 273 (1971). We believe the same rule applies in the use and admission of video tapes in a criminal trial. *See, e.g., Stamper v. Commonwealth,* 220 Va. 260, 257 S.E.2d 808, 816 (1979); Annot., 60 A.L. R.3d 333 (1974).

■ The thirty-minute, color video tape at issue in the present case was taken from a southbound vehicle by officers of the Burleigh County Sheriff's Office on March 1, 1982. It begins at the point Schlickenmayer testified that Karas was put out of his car. While the officers drove, the camera was focused straight ahead at the highway. At one-half mile intervals the car was stopped and a full circle view was taken from outside of the officers' vehicle. This procedure continued for approximately eight miles and ended at the point where Karas's body was found.

Schlickenmayer argues that allowing the jury to view the video tape was prejudicial error basically because the camera failed to focus on "extremely obvious sources of shelter" along the route that Karas traveled.

We have examined the video tape and the evidence in the record and conclude that the video tape is not inaccurate or unduly prejudicial and that the trial court did not abuse its discretion in allowing the jury to view the video tape. We note that several farms and buildings are visible on the video tape. The record reveals that at one point during the showing of the video tape to the jury, the video tape was stopped so that one of the officers could point out one of the houses near the road. In his chambers immediately prior to allowing the video tape

to be shown, the trial judge told counsel that he had viewed the video tape and had also driven his car to the area in question, and that he was "satisfied that it is a reasonable representation of what exists in this general area". The judge was also satisfied that the video tape was not offered in an attempt to recreate the conditions that existed during the evening and early morning hours in question, but was offered only to show "the general area or the type of road that existed for those seven and-a-half miles".

The trial judge also allowed the defense to introduce pictures of "anything that can be seen from that road". Schlickenmayer subsequently introduced eight color photographs depicting various farm buildings and houses visible from the highway. The photographer was allowed to testify as to the approximate distances of those farms and buildings from the road. We also note that a detailed map of the highway was introduced in evidence and that the photographer was allowed to affix the pictures to the appropriate locations on the map.

In light of the foregoing, we believe that the trial court properly exercised its discretion in allowing the jury to view the video tape.

### III

### JURY VIEW

Finally, Schlickenmayer argues that the trial court erred in denying his request that the jury be taken to personally view the area in question. He contends that a jury view of the area was required in order to "repair the damage" caused by the admission in evidence of the "misleading, prejudicial videotape".

■ Section 29–21–26, N.D.C.C., provides:

"*29–21–26. Jury may view place.* —When, in the opinion of the court, it is proper that the jurors should view the place in which the offense was charged to have been committed, or in which any other material fact occurred, it may order the jurors to be conducted in a body, in

the custody of proper officers, to such place, which must be shown to them by a person appointed by the court for that purpose, and the officers must be sworn to suffer no person to speak to nor communicate with the jurors, nor to do so themselves, on any subject connected with the trial, and to return them into court without unnecessary delay, or at a specified time. The trial judge shall be present and the state's attorney and counsel for the defendant may be present at the view by the jurors."

As the wording of § 29–21–26, N.D.C.C., suggests, and as other courts have held, the decision of whether or not to grant or deny a request for a jury view rests in the sound discretion of the trial judge, and, as such, the trial court may properly deny such a request when the view would serve no useful purpose in illustrating testimony. *See, e.g., Thompson v. State,* 399 A.2d 194, 198 (Del.1979); *Snyder v. State,* Ind.App., 393 N.E.2d 802, 807 (1979); *State v. Melvin,* 390 A.2d 1024, 1032 (Me.1978); *Commonwealth v. Andrews,* —— Mass.App. ——, 422 N.E.2d 484, 486 (1981); *State v. Gone,* 179 Mont. 271, 587 P.2d 1291, 1294–1295 (1978).

In the instant case, the trial judge, in his chambers, told defense counsel that he did "not believe that a view . . . of the general area will add anything that the video tape doesn't already show, with the exception of maybe the one house you are concerned about". We have concluded earlier herein that the video tape was not inaccurate or unduly prejudicial. We note once again that the defense introduced eight photographs of farms and houses visible from the road. In light of the evidence introduced in the trial, we agree with the trial court that a jury view of the area would have had limited value, if any. Accordingly, the trial court did not abuse its discretion in denying Schlickenmayer's request for a jury view of the area.

For the reasons stated in this opinion, the judgment of conviction is affirmed.

ERICKSTAD, C.J., and PEDERSON, VANDE WALLE and SAND, JJ., concur.