STATE of North Dakota, Plaintiff and Appellee,

v.

Joseph Lesley BROWN, Defendant and Appellant.

Crim. No. 906.

Supreme Court of North Dakota.

July 21, 1983.

Robert J. Snyder [argued], of Bickle, Coles & Snyder, Bismarck, for defendant and appellant.

John M. Olson, Sp. Asst. State's Atty. [argued], Gail H. Hagerty, State's Atty., and John J. Fox, Asst. State's Atty., Bismarck, for plaintiff and appellee.

PAULSON, Justice.

Joseph Lesley Brown appeals from a judgment of conviction entered on November 1, 1982, by the District Court of Burleigh County upon a jury verdict finding him guilty of felonious restraint. The major issue raised on appeal is whether or not a witness whose memory has been previously enhanced through the use of hypnosis may testify in a criminal trial in North Dakota. We conclude that a witness who has previously been hypnotized is not rendered incompetent to testify. Rather, we hold that hypnotism affects the credibility

but not the admissibility of such testimony. For the reasons which follow, we affirm the judgment of conviction.

## I. THE FACTS

At approximately 3 a.m. on June 4, 1982, Michelle Fender, a truck driver, was driving her truck south on U.S. Highway 83 several miles north of Bismarck. According to Fender, as she turned east onto a gravel road leading to the Cenex Asphalt Terminal, a person, later identified as the 19-year-old complaining witness ["Linda", a pseudonym], jumped out of the ditch and ran toward the truck, frantically waving her arms. Linda, who was wearing a softball uniform, began running back and forth in front of and alongside the truck and eventually climbed up on the front of the truck cab. Fender, who described Linda as "hysterical", said that Linda told her that she had been "raped" and "choked", that she had "wet her pants", and that she had broken her eyeglasses. Fender also described Linda's eyes as "crazy, just out of a horror movie". After some discussion, Fender offered Linda a ride into Bismarck for the purpose of obtaining help. During the trip to Bismarck, Linda calmed down somewhat, but remained generally incoherent. Upon arriving in Bismarck, Fender stopped at a gasoline service station and telephoned the police.

The police arrived and took Linda to a local hospital for an examination. While in the hospital emergency treatment room, Linda was interviewed by Burleigh County Deputy Sheriff David Schweitzer. Deputy Schweitzer said he initially observed that Linda "was under a great deal of emotional stress at the time, seemed a bit confused, a little disoriented", and that he was able to elicit only "bits and pieces" of information from her. Linda told Schweitzer that early in the evening of June 3, 1982, she had been playing softball. After the ballgames, Linda and her teammates drank some beer and then proceeded to the Pizza Hut Restaurant, where they ate pizza and drank some more beer. The next thing Linda remembered was driving north on U.S. Highway 83 with "Larry", her softball coach. However, Linda was unable to explain how she and Larry would have happened to have been in the car together. Linda told Schweitzer that she remembered the car turning off of the highway onto a side road and subsequently being driven into a field. Linda stated that at that point she thought that her companion became violent and attempted to have sex with her. She also recalled that her assailant started choking her and "screaming something about Vietnam". She also remembered him saying something about "Charlie". Besides identifying Larry as a possible suspect, Linda described her assailant as being "fairly well built" or as having a "husky build". Linda also told Schweitzer that she had "no idea" where her car was.

The doctor who conducted the medical examination of Linda also described Linda as "confused" and "upset". Although tests established that she had not been raped, the doctor determined that, because of the existence of petechial hemorrhages behind her eyes and ears, someone had tried to choke her.

At this stage, Linda's parents had been informed of the incident. After giving police the license number and description of the missing vehicle, a brown station wagon, her parents took her home.

At approximately 6 a.m. that same morning, police officers found the station wagon parked in a small park on the south side of Bismarck. The officers found the interior of the vehicle to be in a "very messy condition", with crushed beer cans scattered throughout and ice cream from a half-gallon container smeared over the back seat. Schweitzer stated that the hood of the station wagon felt "fairly warm to the touch".

While investigating the scene, the police officers discovered the defendant, Brown, walking in another area of the park carrying a yellow book bag and a clear plastic garbage bag containing McDonald's Restaurant food cartons. Brown was wearing a light blue T-shirt, blue jeans, a navy nylon jacket, and brownish-black soiled work boots. When questioned as to where he had

gotten the book bag, Brown stated that he had found it on a picnic table behind some evergreen trees. The book bag contained several McDonald's Restaurant hamburger containers, a softball, a digital watch, a pair of eyeglasses, and a clutch purse containing Linda's identification. Brown also told the officers that he had been staying with a friend in Bismarck, but that he was not certain of the friend's address. Following a brief discussion with Brown, the police took possession of the book bag, and Brown was released pending further investigation.

In the meantime, Larry, Linda's softball coach, was questioned by officers of the Burleigh County Sheriff's Department and released.

Later that same morning, Linda, accompanied by her parents, went to the Burleigh County Sheriff's Department where she was interviewed by Detective William Yeck. Detective Yeck testified that Linda was still confused as to her recollection of the incident, but that she now knew Larry was not her assailant. Linda stated that she remembered attending a softball game and afterward going to the Pizza Hut Restaurant with her friends. At approximately midnight, they left the restaurant and she drove three of her friends home. She had no clear recollection of what occurred after dropping off the last person. She remembered traveling north on Highway 83, but that she was not the person driving the vehicle. She also remembered kicking at the brake pedal in an attempt to stop the vehicle. She further related that the car went into the ditch or median, and then was driven south toward Bismarck. Linda remembered the car eventually turning left onto a gravel road, proceeding for a short distance, and again turning left into a field near a row of trees. She said that at this point, the person who had been driving the car began to choke her. She struggled with the individual, somehow broke free, and escaped from the vehicle. As she watched, the person then drove off with her car.

Linda also remembered walking out of the field onto the gravel road and heading westbound toward the highway. She also told Detective Yeck that she recalled coming upon a parked truck with a female driver, "waking the truck driver or getting the attention of the truck driver in some way and requesting help".

When questioned as to the identity of her assailant, Linda described him as being "heavy set", and wearing blue jeans and leather work boots. She also told Detective Yeck that the individual had long dark hair, and that she thought he had a beard, but that the beard was bushier at the chin than anywhere else on his face. She could not remember if it was a goatee or if it was a beard that was just more pronounced at the chin.

Following the interview, Detective Yeck, in an effort to help restore Linda's recollection of the events of the previous evening, transported her and her parents north on Highway 83 in a Burleigh County Sheriff's Department patrol car for the purpose of attempting to ascertain the scene of the assault. While driving north on Highway 83, still within city limits, the patrol car passed a male Native American individual walking northbound along the highway. Upon seeing the person, Linda, who was seated in the front seat of the patrol car, "had a reaction", according to Yeck. Detective Yeck testified that "She began to kind of tense up and choke, and she automatically reached behind her and locked the squad car door". Linda's father, who was seated in the back seat with his wife, testified that Linda "immediately lurched down in her seat and reached over and shoved down the door lock on the side of her door and then immediately looked straight ahead and just kind of stared". When asked by Yeck whether or not the person walking along the highway looked familiar to her, Linda replied that she was not sure, but that the person could be her assailant.

Detective Yeck turned the patrol car around and passed the individual again so that Linda could have another look at the person. Yeck then called for assistance from the Burleigh County Sheriff's Department. Another squad car arrived and the individual was detained at the scene and

questioned. The person turned out to be the defendant, Brown.

Yeck parked his vehicle behind the other patrol car alongside the highway, in order to give Linda an opportunity to obtain a clear look at the individual. Linda again stated that, although there was a possibility that the person could have been her assailant, she was not sure.

Brown was then transported in the other patrol car to the Burleigh County Jail for questioning. Yeck proceeded north with Linda and her parents and eventually discovered fresh vehicle tracks in a field near the Cenex Asphalt Terminal. Linda recognized the field as the place where she had been attacked. They then returned to the Sheriff's Department.

While Brown was being processed at the Sheriff's Department, Linda sat on a chair in a hallway. On at least one occasion, Brown walked directly in front of her on the way to different rooms for the purpose of being processed. Linda was also shown two photographs of Brown, a front view and a side view, which were taken at the Sheriff's Department. Linda once again stated that she thought Brown could be the individual who attacked her, but she could not be sure. Yeck, who spoke with Brown at the time, described him as wearing blue jeans, a pale blue pullover shirt, and leather work shoes. He was also carrying a reversible tan jacket with blue lining. Yeck also described Brown as "extremely dirty", and he noticed that Brown had a mark on his right hand, "an irritation of some sort".

Brown told the police that he was on his way to Wilton to look for welding work when he was found walking on Highway 83. He also admitted to the police that he had taken the yellow book bag out of Linda's car when it was parked at the park. He said he had spent the night in the park and when he awoke about daylight, he noticed the station wagon there. Brown said that on the previous evening he and two friends, "Rick" and "Cletus", went down by the railroad tracks in Bismarck about 7 p.m. and drank three bottles of wine together. He stated that the three men then went to see a movie. Afterward, they "lost" Cletus, so he and Rick walked to the Main Bar "for a few drinks" and stayed until nearly closing time. Brown said that while they were at the bar, Rick got involved in a fight, so they parted company. According to Brown, he walked to McDonald's Restaurant and took several hamburgers he had found in a dumpster. He stated that he then walked to the park where he went to sleep.

After brief questioning by the police, Brown was released.

At approximately 2:15 p.m. that same day, Linda was placed under hypnosis by Agent Richard Hilde of the North Dakota Crime Bureau. Agent Hilde and Detective Yeck were present with Linda during two hypnotic sessions, which were each videotaped. In the first hypnotic session, which lasted approximately one hour, Linda was asked to imagine herself to be a news reporter and describe the entire incident. Linda proceeded to emotionally and vividly describe, and virtually reenact, the events of the preceding evening.

Linda stated that at approximately 12:30 a.m. on June 4, 1982, she dropped a friend off in south Bismarck and then drove toward her home in north Bismarck alone in her family's station wagon. At the intersection of 17th Street and Broadway Avenue, Linda stopped at a stop sign and heard something fall off the back seat of the car. After she had turned around to see what had fallen, a man came up to her car, got in the driver's side and pushed her to the other side of the front seat. They traveled through Bismarck, ultimately heading north on Highway 83. Linda said she tried on several occasions to stop the car by putting her feet on the brake, but the man kept pushing her away. Linda also said she pleaded with the man to let her out of the car, but he refused, and, instead, turned the vehicle around and headed back south toward Bismarck. He then turned onto a gravel road, and when Linda asked him what he was going to do, he told her to "Shut up. I'm going to kill you". When he turned into a field and stopped the car, the man began to choke her. Linda, who at

this point during the hypnotic session began to gasp for air, said she thought she was going to die. She said that during the struggle she managed to "knee" the man in the groin and was then able to release herself from his grasp and escape from the car. She watched as the man left with the station wagon. Linda, who described herself as "hysterical", also related under hypnosis how she came upon a semi-truck parked on the road, and stated that the driver was sleeping.

About thirty minutes after her first hypnotic session, Linda was placed under hypnosis again for approximately twenty minutes and was asked to describe her assailant. She did so in extreme detail. She described the man as approximately five feet nine or ten inches tall, with a "pot belly", long dark shoulder-length hair, and a goatee and a mustache, which was "not well kept". She further described the man as having a "fat face", "puffy cheeks", "sleepy-looking eyes", "dark skin", and said "he could be an Indian". She also described the man as "dirty", with "fat, stubby fingers" and a "scratch on the back of his right hand". She also said he was dressed in blue jeans, a T-shirt, and leather work boots, all of which were dirty.

Linda's description of her assailant matched that of the defendant, Brown.

Shortly after the hypnotic sessions, Linda was shown a photographic lineup containing a picture of Brown. Before Detective Yeck could finish explaining the purpose and function of the lineup, Linda positively identified the picture of Brown as the person who had assaulted her. Brown was once again detained by the police and this time charged with class A felony kidnapping pursuant to § 12.1–18–01(1)(d) of the North Dakota Century Code.

At a preliminary hearing held on June 17, 1982, Linda took the stand and positively identified Brown as her assailant. An information formally charging Brown with kidnapping was filed on June 21, 1982, and Brown entered a plea of not guilty. On July 2, 1982, the defendant moved to suppress any proposed in-court identification of Brown by Linda on the ground that such identification was made subsequent to Linda being hypnotized, and was, therefore, per se inadmissible. The district court entered an order denying the defendant's motion to suppress on August 6, 1982.

Commencing on September 21, 1982, the case was tried before a jury in the District Court of Burleigh County. Among those testifying on behalf of the State was Linda. Linda testified, over Brown's objection, and positively identified Brown as the person who assaulted her. Aaron E. Rash, supervisor of the Crime Laboratory Division of the State Laboratories Department, testified that head hair taken from Brown matched hair samples taken from Linda's jacket. Although Rash noted that hair cannot be positively associated with a particular individual, he stated that the hair was definitely of Mongoloid or Native American origin. Marnell Engstrom and Kris Vetter, who worked at Hardee's Restaurant on Highway 83 at the time of the incident, testified that they observed a Native American male with a reddish-brown station wagon rummaging through a dumpster in the Hardee's parking lot at approximately 2:30 a.m. on June 4, 1982. They further testified that the man had long dark hair and was wearing a blue T-shirt and blue jeans. Although they could not positively identify Brown as the man they saw, they testified that he resembled the man they saw.

Brown testified in his own behalf and denied having any involvement in the crime. The defense also presented a videotaped deposition of Dr. Bernard L. Diamond, a psychiatrist from San Francisco, California, and a nationally renowned expert in the field of hypnosis, who testified in essence that the use of hypnosis on a prospective witness at a criminal trial is so inherently dangerous that any testimony by such a person should not be allowed. Dr. Diamond also attacked the procedures used by Agent Hilde in hypnotizing Linda as being unduly suggestive.

On rebuttal, the State called Agent Hilde who testified as to his qualifications for performing hypnosis and as to the proce-

dures used during the two hypnotic sessions with Linda. The State also presented a videotaped deposition of Dr. Martin Reiser, director of Behavioral Science Services of the Los Angeles, California, Police Department, a leading authority on the use of investigative hypnosis by law enforcement in the United States. Dr. Reiser testified, in essence, that hypnotically enhanced memory should not bar a witness from testifying in a criminal trial. On rebuttal, and over the defendant's objection, the State also presented for the jury's view the two videotapes of Linda's hypnotic sessions.

On September 24, 1982, the jury found Brown guilty of the lesser included offense of felonious restraint, a class C felony. *See* § 12.1–18–02, N.D.C.C. On September 29, 1982, the defendant moved for a new trial, again on the ground that Linda should not have been allowed to testify and identify the defendant in court because she had been previously hypnotized. The district court entered a memorandum opinion and order denying the defendant's motion for a new trial on October 12, 1982. The court reasoned that Linda's testimony and in-court identification of Brown after having been hypnotized was admissible, "and only posed a jury question of her credibility". Judgment of conviction was entered against Brown on November 1, 1982, and he was sentenced to serve five years in the North Dakota State Penitentiary.

Brown's major contention on appeal is that the trial court committed reversible error in allowing Linda to testify after her memory had been previously enhanced through the use of hypnosis.

## II. THE EXPERT TESTIMONY

Dr. Diamond, the defense's expert witness, defined "hypnosis" as "an artificially [*sic*] induced state of altered consciousness characterized by increased suggestibility, suspension of critical judgment and psychological and physical relaxation". As noted earlier herein, Dr. Diamond testified that the use of hypnosis on a prospective witness at a criminal trial is so inherently dangerous that any testimony by such a person cannot be allowed.

According to Dr. Diamond, the problem is that hypnosis can result in what is known as "confabulation",[1] a process of combining fact and fantasy during hypnosis which can produce a memory after hypnosis which the person believes to be true, but which actually can be a mixture of truth and fantasy. The problem is compounded, according to Dr. Diamond, because after the person is hypnotized, he or she believes the testimony to be true even if it is not true. Further, Dr. Diamond notes that the use of hypnosis has an additional effect of making the hypnotized person absolutely sure, calm, and unshakable in their testimony. Dr. Diamond thus concludes that the testimony of a hypnotized person has become so "contaminated" by the hypnosis itself that the person must not be allowed to testify in court.

Dr. Diamond testified as follows:

"A ... One of the most consistent and most profound affects [*sic*] of hypnosis is the suspension of critical judgement [*sic*]. And this suspension of judgement [*sic*]—critical judgement [*sic*]—lasts indefinitely, even long after the hypnotic trance is all over with. So the hypnosis is a very useful device for taking a witness who is unsure and uncertain and who is very self-critical and doubtful of the validity of their memories. In a very short time, under hypnosis, you can alter the individual's attitude towards their memo-

1. Brown contends that the present case has produced two "substantiated incidents" of confabulation on the part of the complaining witness, Linda. The first instance, according to Brown, is that during a hypnotic session Linda described in detail seeing a person walking down the sidewalk, crossing the street, approaching her car door, and entering her car. However, during the trial, Linda testified that she did not see the person before he entered her car. The second instance, according to Brown, is that during a hypnotic session she described coming upon a parked truck on the road and awakening the driver. However, during the trial, Michelle Fender, the truck driver, testified that she was driving the truck when she first encountered Linda.

ries. So when they come out of the hypnosis, they are now absolutely positive beyond all doubts and uncertainties as to the correctness and truth of their memories. Experiments have demonstrated over and over again this sense of confidence and the belief in the truth and infallibility of one's memory after hypnosis has nothing whatsoever to do with whether the memory is really true or not—that one has this false memories as well as for true memories.

.    .    .    .    .

"A ... You can hypnotize a person and the person can make up a story out of their own psychological needs and none of the memory can be true, and they will have the same sense of confidence and firm belief that this is a true and valid memory. In most instances, the hypnotic memories are some kind of mixture of real and fantasy, confabulated thoughts, things that did happen and things that didn't happen. And yet, the individual's own sense of confidence and belief in what they had is just as firm for the false portions of the memory as for the correct portions of memory."

*See generally* Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness,* 68 Calif.L.Rev. 313 (1980).

In regard to Linda's hypnotic sessions, Dr. Diamond testified as follows:

"Q. [By Robert Snyder, defense counsel] Doctor, in addition to, again, suggestions or the suggestiveness of the alleged victim in this case, were you able from the tape to detect any significant posthypnotic suggestions that were given to her?

"A. Yes. I think the hypnotist in this case gives the subject specific instructions about how they are supposed to—what they are supposed to do and remember after they awaken from the hypnotic trance. These are known as 'posthypnotic suggestions' because although they are given in the hypnotic state, the effect is supposed to take place after they come out of the hypnotic state, and we know that this occurs just this way.

"And the—after the first hypnotic state, the individual is given suggestions about her—about how to be hypnotized the second time. And in the second hypnotic state, towards the end, the subject is given specific instructions about what they are supposed to remember afterwards. She—in the first place, the subject is told that she has done very well. In other words, the effect of such an instruction is to say, 'What you remember is what we want to hear.' And then at the very end, he says, and I quote:

'You are going to feel ever better now. You'll feel pretty good about this now. Your memory will be refreshed, and you may even remember more details later on, and when you do, you will have a desire to get ahold of Bill Yeck—' the investigative police officer —'and let him know your desire to want to cooperate on your own as you have done now.'

"Q. What is the effect of that suggestion?

"A. These are, of course, commands given to the individual in this very suggestible state, addressed really to her unconscious mind to tell her what it is she is supposed to do after she awakens from the hypnosis. In a susceptible person, these commands will be followed. And furthermore, he tells her, and I quote: 'And you won't be upset about this anymore.'

"Now the effect of commands about 'you will feel good' and 'you won't be upset' is to remove all doubts and uncertainties, all anxieties, all hesitations, all sense of guilt and responsibility for anything, and to be able to sort of clearly and coherently relate what happened as if it were a truthful story.

"Q. Let me interject for a minute, Doctor. From your view of this tape, would you then expect in your opinion that ... [Linda] would be able to relate this incident very calmly, clearly and positively?

"A. Yes. My expectation would be that after this hypnotic experience, the

witness would have no difficulty in knowing for certain what she believed her memory to be and to be absolutely confident in her correctness of memory and all doubts and uncertainties and hesitations and conflicts and contradictions would have been eliminated from the story. So this—in my opinion, to have a hypnotic session of this kind is really to improperly and, I think, even illegally coach the witness into making up a story which will fit the needs of the particular case."

Dr. Reiser, the State's expert witness, took the opposite position from that of Dr. Diamond.[2] Dr. Reiser defined "hypnosis" as "an altered state of consciousness, which is characterized by an increased focus of attention, a heightened state of mental concentration, and a decrease of focus and concern about peripheral, or surrounding noises and stimuli". Dr. Reiser stated that in his experience he has found that a person is no more or less suggestible under hypnosis than the person would be out of hypnosis. He also testified that the use of hypnosis does not invariably result in confabulation, but only produces a recollection of what is already in the mind of the person hypnotized. Dr. Reiser also testified that "There is no greater propensity to confibulate [sic] in my experience by witnesses and victims of major crimes in hypnosis than there is by other eyewitnesses without hypnosis".

Dr. Reiser testified as follows:

"Q. By ... [State's Attorney John] Olson: Does the hypnotic subject become unshakibly [sic] confident in his or her memory, or memories of events?

"A. No.

"Again, I don't think this is a basic hypnosis issue. I think it's an issue of a particular individual's function, and how a person's mental processes work. Specifically I have not found that people merely because of being hypnotized invariably become unshakible [sic] in their

post-hypnotic view of what happened during a situation, or what their memory is. No, I don't think that's the case. However, an individual with or without hypnosis may become more sure of recall. And I think the literature is quite clear on eyewitness testimony generally, that after a certain number of reviews without hypnosis of going through a crime event a person may become more sure of the recall at the end of that multi-review process than before. So I don't see that as a hypnosis issue at all.

"Q. Can the hypnotist himself, wittingly or unwittingly, influence the subject as to memory?

"A. There's less likelihood of influencing the subject in hypnosis than there is in a routine nonhypnotic interview, essentially because the witness' eyes are closed and therefore 60 percent, approximately, of input that a person gets, which is through the visual senses, is blocked off because of closed eyes. So body language doesn't matter when the person's eyes are closed, and so on, so if anything there is less likelihood of influencing the person, assuming that the interview is conducted in a correct, neutral, nonleading fashion.

.    .    .    .    .

"A. ... All hypnosis is is an interview technique that hopefully in some three-quarters will enhance memory by allowing the person to relax more. It is not a truth-detection instrument. No one who knows anything about hypnosis claims that it gets at the truth at all. A person can lie, can make up things, can distort, can do all of those things under hypnosis if he or she is motivated to do that."

See generally M. Reiser, Handbook of Investigative Hypnosis (1980).

In regard to Linda's hypnotic sessions in particular, Dr. Reiser testified as follows:

---

2.   This controversy has no doubt given rise to a wealth of scholarly literature in recent years. See, e.g., Note, *Hypnotically Induced Testimony: Credibility versus Admissibility,* 57 Ind.L.J. 349 (1982); Note, *Safeguards Against Suggestiveness: A Means for Admissibility of Hypno-*

*Induced Testimony,* 38 Wash. & Lee L.Rev. 197 (1981); Note, *The Admissibility of Testimony Influenced by Hypnosis,* 67 Va.L.Rev. 1203 (1981); Comment, *Hypnosis-Its Role and Current Admissibility in the Criminal Law,* 17 Willamette L.Rev. 665 (1981).

"Q. [By State's Attorney Olson] Could you determine from observing those interview sessions whether or not there was improper cueing, or improper suggestions made by Agent Hilde?

"A. Not really, no. There were during the second—what I would call the second part of the session after the tapes were changed—I saw this as one session with a break in between the changed tapes.

"In the second part of the section, Mr. Hilde did ask some specific questions, but I didn't consider those improper questions.

"Q. So were any leading questions, or impermissible procedures used that you—

"A. There were some leading questions. I would not consider them impermissible, though.

"The leading questions are a matter of degree. There could be mildly leading questions to severely-leading questions, and Mr. Hilde did not, as I reviewed this two times, ask any severely leading questions to this witness.

"Q. Is there any evidence in your opinion as to any hypersuggestibility in this witness?

"A. Not really. As a matter of fact, the second part of the session after the tape was changed, which was about 19 minutes long as I timed it, there were specific instances where questions were asked of the subject where she said no in answer to a mildly leading question.

"For example, did the subject have sideburns was a question. The answer was no. Now that could be considered a mildly leading question. It's really a zeroing-in kind of question when you're trying to get facial structure of somebody. But the answer was no. Now if she were completely suggestive at the question did he have sideburns she would have said oh, oh, yes, yes, he had sideburns, wanting to, as our opponents would say, please the hypnotist and confibulate [sic] this material, make it up in order to fill in that gap. Now obviously that did not happen.

"Did he wear glasses? No. Again another no, indicating that this witness was discriminating. She was using her critical judgment, she was not hypersuggestible.

"And another mildly leading question, 'Does this person remind you of somebody,' and she said, 'Well, he's as tall as Larry,' the coach of the softball team. And then she went on to say about five nine or five ten, and then she added spontaneously, 'And he had a moustache [sic], which was not well kept.' So this was not specifically part of that question, but she spontaneously added that information of her own volition. And then she mentioned that he had a round face and dirty work boots, and so on and so forth.

"So that taking this whole session in sequence in terms of the way it went, the first approximately 56 minutes before the tapes were changed, this was essentially a free narrative by the subject, by the witness, ... [Linda], with essentially no questions being asked by the hypnotist. So there could have been no cueing, no suggestions during that first 56 minutes. And she very clearly, from my way of interpreting it, went through that event that she experienced abreacting, or showing emotion at the proper places. And at that point where she was talking about being choked by this person and re-experiencing not being able to breathe, anybody viewing that tape I think would get the impression pretty clearly that this was a revivication or a reliving of that experience in more detail in this review hypnotically than she was able to give the detectives prior to hypnosis."

## III. ADMISSIBILITY OF HYPNOTICALLY ENHANCED TESTIMONY IN A CRIMINAL TRIAL

In *State v. Pusch,* 77 N.D. 860, 46 N.W.2d 508 (1950), our court first dealt with the use of hypnosis in a criminal trial. In *Pusch,* the defendant was charged with attempting to poison his wife. The defendant was placed under hypnosis by an experienced

hypnotist and thereafter made statements indicating that he was innocent of the crime charged. The defendant attempted to offer evidence, including a recording, that all of the defendant's answers to questions given him under hypnosis indicated that he was innocent, and that the hypnotist was qualified to attest to the truthfulness of the answers.

The trial court in *Pusch* sustained objections to the defendant's offer of proof and rejected the testimony. Our court affirmed, stating that "the evidence was clearly inadmissible". *Pusch, supra* 46 N.W.2d at 522.

*Pusch* is distinguishable from the instant case. The defendant in *Pusch* sought to introduce testimony and a recording of statements he had made while he was under hypnotic induction for the purpose of proving their truth. In the instant case, the issue is whether or not a witness may testify in person after her memory had been previously enhanced through the use of hypnosis.[3]

The question involved in this case, a question of first impression in our jurisdiction, lends itself to no easy solution. Jurisdictions have essentially taken three different approaches regarding the use of testimony from witnesses whose memories have been enhanced by hypnosis.

The majority of jurisdictions appear to have declared that hypnotically induced testimonial recall generally poses no barrier to admissibility, but, rather, affects only the weight of the testimony. The federal courts have adopted this rule. *See United States v. Awkard,* 597 F.2d 667 (9th Cir.), *cert. denied,* 444 U.S. 885, 100 S.Ct. 179, 62 L.Ed.2d 116 (1979); *United States v. Adams,* 581 F.2d 193 (9th Cir.), *cert. denied,* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978); *United States v. Waksal,* 539

F.Supp. 834 (S.D.Fla.1982); *United States v. Narciso,* 446 F.Supp. 252 (E.D.Mich.1977). *See generally* Annot., 50 A.L.R.Fed. 602 (1980). The same approach has been taken in Georgia [*Creamer v. State,* 232 Ga. 136, 205 S.E.2d 240 (1974)]; Illinois [*People v. Smrekar,* 68 Ill.App.3d 379, 24 Ill.Dec. 707, 385 N.E.2d 848 (1979)]; Indiana [*Pearson v. State,* Ind., 441 N.E.2d 468 (1982); *Morgan v. State,* Ind.App., 445 N.E.2d 585 (1983)]; Louisiana [*State v. Wren,* 425 So.2d 756 (La.1983)]; Missouri [*State v. Greer,* 609 S.W.2d 423 (Mo.Ct.App.1980), *vacated on other grounds,* 450 U.S. 1027, 101 S.Ct. 1735, 68 L.Ed.2d 222 (1981)]; North Carolina [*State v. McQueen,* 295 N.C. 96, 244 S.E.2d 414 (1978)]; Oregon [*State v. Brom,* 8 Or. App. 598, 494 P.2d 434 (1972); *State v. Jorgensen,* 8 Or.App. 1, 492 P.2d 312 (1971)]; Tennessee [*State v. Glebock,* 616 S.W.2d 897 (Tenn.Cr.App.1981)]; and Wyoming [*Chapman v. State,* 638 P.2d 1280 (Wyo.1982)]. *See generally* Annot., 92 A.L. R.3d 442 (1979).

Other courts have allowed the admission of hypnotically induced testimony subject to compliance with certain procedural safeguards designed to ensure reliability. These jurisdictions include Florida [*Brown v. State,* 426 So.2d 76 (Fla.Dist.Ct.App. 1983)];[4] New Jersey [*State v. Hurd,* 86 N.J. 525, 432 A.2d 86 (1981)]; New Mexico [*State v. Beachum,* 97 N.M. 682, 643 P.2d 246 (Ct.App.1981)]; and Washington [*State v. Martin,* 33 Wash.App. 486, 656 P.2d 526 (1982); *State v. Long,* 32 Wash.App. 732, 649 P.2d 845 (1982)].

Recently, a number of jurisdictions have held that a witness who has undergone pretrial hypnosis is incompetent to testify as to the subject matter discussed at the hypnotic session, and, thus, that person's testimony is *per se* inadmissible. These jurisdictions include Arizona [*State v. Mena,* 128 Ariz. 226, 624 P.2d 1274 (1981)]; California [*People v.*

---

**3.** We note that the jury in this case was allowed to view the videotapes of Linda's hypnotic sessions. This is discussed *infra* at pages 152 and 153.

**4.** Before the *Brown* court set forth its series of safeguards, the Florida courts followed the rule that hypnotically induced testimony is admissible and the credibility thereof is for the jury to determine. *Clark v. State,* 379 So.2d 372 (Fla. Dist.Ct.App.1979). The court in *Brown, supra* 426 So.2d at 90, concluded that *Clark* was correctly decided, but further "recommended" that several safeguards be followed.

*Shirley*, 31 Cal.3d 18, 181 Cal.Rptr. 243, 641 P.2d 775, *cert. denied,* —— U.S. ——, 103 S.Ct. 13, 73 L.Ed.2d 1400 (1982) ]; Maryland [*Collins v. State,* 52 Md.App. 186, 447 A.2d 1272 (1982); *Polk v. State,* 48 Md.App. 382, 427 A.2d 1041 (1981) ]; [5] Michigan [*People v. Gonzales,* 415 Mich. 615, 329 N.W.2d 743 (1982) ]; Minnesota [*State v. Mack,* 292 N.W.2d 764 (Minn.1980) ]; Nebraska [*State v. Palmer,* 210 Neb. 206, 313 N.W.2d 648 (1981) ]; and Pennsylvania [*Com. v. Nazarovitch,* 496 Pa. 97, 436 A.2d 170 (1981) ].

We further note that many of the jurisdictions which have, as a minority, excluded testimony generated by hypnotically expanded memory, appear to have modified their positions in that a witness may nevertheless testify with regard to those matters which he or she was able to recall and relate prior to hypnosis. These jurisdictions include Arizona [*State ex rel. Collins v. Superior Court, Etc.,* 132 Ariz. 180, 644 P.2d 1266 (1982) ]; Colorado [*People v. Quintanar,* Colo.App., 659 P.2d 710 (1982) ]; Michigan [*People v. Jackson,* 114 Mich.App. 649, 319 N.W.2d 613 (1982); *People v. Wallach,* 110 Mich.App. 37, 312 N.W.2d 387 (1981) ]; Minnesota [*State v. Blanchard,* 315 N.W.2d 427 (Minn.1982); *State v. Koehler,* 312 N.W.2d 108 (Minn.1981) ]; Nebraska [*State v. Patterson,* 213 Neb. 686, 331 N.W.2d 500 (1983) ]; New York [*People v. Hughes,* 88 A.D.2d 17, 452 N.Y.S.2d 929 (1982); *People v. Smith,* 117 Misc.2d 737, 459 N.Y.S.2d 528 (Sup.Ct.Dutchess Cty.1983) ]; and Pennsylvania [*Com. v. Taylor,* 294 Pa.Super. 171, 439 A.2d 805 (1982) ].

As is so often the case in the area of criminal law and procedure, none of the different positions adopted by the various courts which have decided this issue are without practical, conceptual, and legal incongruities.

The courts which have adopted the *per se* inadmissibility rule, and which Brown urges

us to adopt today, have considered expert testimony and other evidence concerning the problems associated with using hypnosis as a means of reviving memory. In general, these courts reason that because hypnosis is a scientific procedure which is capable of irreparably contaminating the memory of the witness, the procedure must satisfy the standard for the admissibility of scientific evidence which was established in *Frye v. United States,* 293 F. 1013 (D.C.Cir. 1923).[6] Because such a procedure, as a means of obtaining accurate recall, has not "gained general acceptance in the particular field in which it belongs", *Frye, supra* 293 F. at 1014, these courts have ruled that the testimony of a witness who has undergone hypnosis to refresh his or her memory is *per se* inadmissible in a criminal trial. *See, e.g., Mena, supra* 624 P.2d at 1297; *Shirley, supra* 181 Cal.Rptr. at 264, 641 P.2d at 796; *Mack, supra* 292 N.W.2d at 768; *Palmer, supra* 313 N.W.2d at 655.

Applying the *Frye* rule to the method by which testimony is hypnotically induced has been criticized by several courts. In *Brown v. State,* 426 So.2d 76, 89–90 (Fla.Dist.Ct. App.1983), the court stated:

"[W]e conclude that the method by which testimony is hypnotically induced is not one that falls within the ambit of *Frye.* '[T]echnically the test is not directly applicable because it is concerned with the admissibility of *expert opinion* deduced from the results of a scientific technique, such as a lie detector test, and not with the admissibility of *eyewitness testimony.*' Note, *The Admissibility of Testimony Influenced by Hypnosis,* 67 Va.L.Rev. 1203, 1217 (1981) (e.s.); *accord, Commonwealth v. Juvenile,* 381 Mass. 727, 412 N.E.2d 339, 342–343 (1980). ˙ Our view is supported by that of the New Jersey Supreme Court in *State v. Hurd,* which observed:

*denied,* 395 U.S. 949, 89 S.Ct. 2030, 23 L.Ed.2d 468 (1969).

**5.** The Maryland courts had previously followed the majority rule that hypnosis affects the credibility, rather than the admissibility, of the testimony. *See State v.. Temoney,* 45 Md.App. 569, 414 A.2d 240 (1980); *Chaney v. State,* 42 Md.App. 563, 402 A.2d 86 (1979); *Harding v. State,* 5 Md.App. 230, 246 A.2d 302 (1968), *cert.*

**6.** We note that our court has never directly adopted the *Frye* rule. *Cf. State v. Swanson,* 225 N.W.2d 283 (N.D.1974).

'Unlike the courts in *Mena, supra,* and *Mack, supra,* the court below did not demand, as a precondition of admissibility, that hypnosis be generally accepted as a means of reviving truthful or historically accurate recall. We think this was correct. The purpose of using hypnosis is not to obtain truth, as a polygraph or "truth serum" is supposed to do. Instead, hypnosis is employed as a means of overcoming amnesia and restoring the memory of a witness. *See* Spector & Foster, *Admissibility of Hypnotic Statements: Is the Law of Evidence Susceptible?,* 38 Ohio St.L.J. 567, 584 (1977).... In light of this purpose, hypnosis can be considered reasonably reliable if it is able to yield recollections as accurate as those of an ordinary witness, which likewise are often historically inaccurate.'

432 A.2d at 92. *See also State v. Beachum,* 97 N.M. 682, 643 P.2d 246, 252 (Ct. App.1981)." [Emphasis in original.]

It has also been argued that the strict *per se* inadmissibility rule is unduly harsh because it denies a victim, who has undergone hypnosis and who may be the only eyewitness to a violent and traumatic crime, the opportunity to tell a jury his recollections of what he saw. Under this line of reasoning, a victim could not even testify to the occurrence of the crime. *People v. Williams,* 132 Cal.App.2d 920, 183 Cal.Rptr. 498, 502 (1982) (Gardner, Associate Justice, concurring).[7] This situation presents the State with the dilemma of choosing to use a particular witness at trial or to use hypnosis on the witness as an investigatory tool. *See Beachum, supra* 643 P.2d at 252.

We also note that those cases which have modified the *per se* inadmissibility rule to allow the witness to testify with regard to those matters which he or she was able to recall prior to hypnosis [*see, e.g., State ex rel. Collins, supra; Koehler, supra; Patterson, supra*] are difficult to reconcile with the leading cases in those jurisdictions adopting the *per se* inadmissibility rule. A major concern in the latter cases was that "Because the person hypnotized is subjectively convinced of the veracity of the 'memory', this recall is not susceptible to attack by cross-examination". *Mack, supra* 292 N.W.2d at 770. *See also Mena, supra* 624 P.2d at 1280; *Palmer, supra* 313 N.W.2d at 653. Under the rationale employed in these cases, it is difficult to envision how a witness whose memory has been "irreparably contaminated" could differentiate between his or her pre- and post-hypnotic memory.[8]

As noted earlier herein, a handful of courts have followed a "middle of the road" approach which allows the admission of hypnotically induced recall testimony, provided that there has been strict compliance with court-formulated standards which the courts reason will minimize the danger of pseudomemory. Representative of the cases in which specific safeguards have been adopted is *State v. Hurd,* 86 N.J. 525, 432 A.2d 86 (1981). The New Jersey Su-

**7.** In a subsequent modification of the *Shirley* decision, the California Supreme Court determined that the testimony of a defendant who submits to pretrial hypnosis will not be rendered inadmissible if he elects to take the stand. The court reasoned that this exception was necessary "to avoid impairing the fundamental right of an accused to testify in his own behalf". *Shirley, supra* 31 Cal.3d at 67, 181 Cal.Rptr. at 273, 641 P.2d at 805.

In regard to this development, a California appellate judge in *Williams, supra* 183 Cal. Rptr. at 502 (Gardner, Associate Justice, concurring), has noted that:

"The idea that the predator may testify and yet his victim may not offends my sense of justice. It appears to me that the scales of justice are tilted—dangerously."

**8.** The Michigan Supreme Court has attempted to deal with this incongruity. After adopting the strict *per se* inadmissibility rule in *People v. Gonzales,* 415 Mich. 615, 329 N.W.2d 743, 748 (1982), the Michigan Court stated:

"We do not foreclose, by this opinion, the use of hypnosis as an extremely useful investigative tool. A party could preserve a witness's prehypnotic testimony by using a ... deposition. After the hypnotic session, the subject would be considered 'unavailable as a witness'."

We believe that this proposed solution nevertheless raises difficult confrontation problems when, as in the instant case, there is no "defendant" at the time of the hypnotic session.

preme Court in *Hurd, supra* 432 A.2d at 96–97, ruled that before a party may introduce hypnotically refreshed testimony, the party must demonstrate compliance with the following requirements:

"First, a psychiatrist or psychologist experienced in the use of hypnosis must conduct the session. . . .

"Second, the professional conducting the hypnotic session should be independent of and not regularly employed by the prosecutor, investigator or defense. . . .

"Third, any information given to the hypnotist by law enforcement personnel or the defense prior to the hypnotic session must be recorded, either in writing or another suitable form. . . .

"Fourth, *before* inducing hypnosis the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them [emphasis in the original]. . . .

"Fifth, all contacts between the hypnotist and the subject must be recorded. . . .

"Sixth, only the hypnotist and the subject should be present during any phase of the hypnotic session, including the pre-hypnotic testing and the post-hypnotic interview. . . ."

In addition, the court in *Hurd, supra* 432 A.2d at 97, ruled that the party seeking to introduce hypnotically refreshed testimony has the burden of establishing admissibility by clear and convincing evidence.

Several of the *Hurd* safeguards have been criticized.

Regarding the first safeguard, that only a licensed psychiatrist or psychologist conduct the interview, Dr. Reiser testified that properly trained law enforcement personnel are actually better qualified to do so. Even Dr. Diamond, the defense's expert witness, admitted that in "most of the cases, the most flagrantly suggestive and improper questioning was done by my medical colleagues". Dr. Reiser also refuted the proposition that the hypnotist should be independent of the prosecution and the defense. He reasoned that this is an ethical or pro-fessional integrity question because once a psychologist or psychiatrist is employed by the defense or the prosecution, that person is, in a sense, no longer a neutral party. Dr. Reiser also stated that the requirement that any information the hypnotist has pertaining to the case should be in writing again poses only an ethical question and is an attempt to impose sterile laboratory conditions unrealistic to the real world. The requirement that before induction the hypnotist should elicit a detailed account of the facts in the case, allows "an extra opportunity for the hypnotist to have more details than is necessary to conduct a neutral, non-leading questioning of the individual", according to Dr. Reiser. Dr. Reiser describes the requirement that only the hypnotist and the subject be present during the interview as "unworkable". He agreed, however, that a complete record, preferably an audio-visual record, should be made of the contacts between the hypnotist and the subject. Dr. Diamond does not believe that the *Hurd* safeguards "are sufficient to sort out what is contamination and hypnotic confabulation and what is reality".

One court has stated that the *Hurd* standards might even have an "affirmatively detrimental effect" in many cases. *People v. Gonzales,* 108 Mich.App. 145, 310 N.W.2d 306, 313 (1981), *aff'd,* 415 Mich. 615, 329 N.W.2d 743 (1982). The court in *Gonzales, supra,* reasoned that the *Hurd* standards, themselves, would give the hypnotic process "an aura of reliability which, in actuality, it does not possess", and, thus, a jury would likely be less critical of the testimony.

The Wyoming Supreme Court has reasoned that although the party proffering the testimony of a previously hypnotized witness may wish to follow the *Hurd* safeguards to fortify the testimony of the witness, "there are too many variables in hypnotism to mandate such requirements". *Chapman v. State,* 638 P.2d 1280, 1283 (Wyo.1982).

Other courts have reasoned that a case-by-case determination under the *Hurd* standards would produce a fertile new field for litigation and thus would consume too much

in the way of judicial resources, would produce conflicting results in different trial courts, and would produce few situations in which hypnotically induced testimony is ever admitted. *See, e.g., State ex rel. Collins, supra,* 644 P.2d at 1294; *Shirley, supra* 181 Cal.Rptr. at 255, 641 P.2d at 787.

The courts which have held that hypnotically induced testimonial recall poses no barrier to admissibility reason that the emphasis should be placed on the credibility, rather than on the competency, of the witness. These courts generally reason that the testimony of a witness whose memory has been enhanced through hypnosis should be treated like other witnesses whose present recollection has been refreshed. The hypnotic session is believed to be just one of many factors which can affect a witness. Under this rationale, the courts conclude that skillful cross-examination will enable the jury to evaluate the effect of hypnosis on the witness and the credibility of his testimony. *See, e.g., Smrekar, supra* 24 Ill.Dec. at 713–714, 385 N.E.2d at 854–855; *Pearson, supra* 441 N.E.2d at 473; *Chapman, supra* 638 P.2d at 1282–1284.

This position has been criticized as being insensitive to the problem of the unreliability of hypnotically induced testimony. The critics also point to the difficulty and expense of calling expert witnesses qualified to testify to the reliability and uses of hypnosis as an investigative tool. It is also argued that to allow a jury to consider hypnotically induced testimony in a criminal trial would result in having the defendant's guilt or innocence depend on the jury's speculating, on the basis of conflicting scientific-medical testimony, whether or not an identification was a true recollection or was implanted by the hypnotist. *See, e.g., Shirley, supra* 181 Cal.Rptr. at 255, 641 P.2d at 787; *Mack, supra,* 292 N.W.2d at 770; *Hurd, supra* 432 A.2d at 98 (Sullivan, Justice, concurring in the result).

Having carefully considered the pros and cons of the various positions adopted by the courts in deciding this issue, and having weighed the benefits of hypnotically induced recall testimony against the inherent risks, we are not convinced that a witness should be rendered incompetent to testify merely because he or she was hypnotized during the investigatory phase of a criminal case. Rule 601 of the North Dakota Rules of Evidence provides that "Every person is competent to be a witness except as otherwise provided in these rules." Our rules of evidence do not provide that a previously hypnotized witness is incompetent to testify. We believe that an attack on credibility is the proper method of determining the value of hypnotically induced testimony. *See* Rule 607, N.D.R.Ev.; *Chapman, supra* 638 P.2d at 1284. Accordingly, we align ourselves with the majority of jurisdictions which have held that hypnosis affects credibility but not admissibility.

Flatly rejecting testimonial evidence because it might be suspect is a proposition we do not favor. If we were to apply to all witnesses the concern with suggestibility and difficulty of cross-examination which is exhibited in the decisions from the jurisdictions which have adopted the *per se* inadmissibility rule in regard to hypnotically induced testimony, "we would not allow a lawyer to talk to his witnesses before trial, we would exclude most identification testimony, and relatives and friends of a party could be excluded as witnesses". *State ex rel. Collins, supra* 644 P.2d at 1277 (Holohan, Chief Justice, dissenting).[9]

Should our decision result in exposing the jury in each case to the testimony of expert witnesses as to the reliability and uses of hypnosis as an investigative tool, so be it. We believe this alternative is preferable to the potential exclusion of relevant testimonial evidence and the end of hypnosis as an investigative tool in this jurisdiction. Expert scientific and medical testimony is hardly a new phenomenon in a criminal trial setting. For example, jurors are often exposed to conflicting medical testimony

---

**9.** In criticizing the *per se* inadmissibility rule, the dissent in *State ex rel. Collins, supra,* also pointed out that "it would indeed be unfortunate if the defense were prevented from using the testimony of a witness which might exonerate the defendant".

152

when a defendant places his sanity at issue. We are firmly of the belief that jurors are "quite capable of seeing through flaky testimony" and pseudo-scientific "clap-trap". *People v. Williams,* 132 Cal.App.3d 920, 183 Cal.Rptr. 498, 502 (1982) (Gardner, Associate Justice, concurring).

█ However, we are not unaware of the potential for abuse in the use of hypnotically induced testimony in a criminal trial. Thus, we believe the following facts are significant in regard to the instant case:

1. A valid investigatory purpose existed for placing the witness under hypnosis. The evidence established that Linda was unable to recall significant portions of her ordeal with the assailant.

2. The hypnotist was trained and experienced. Agent Hilde testified that he had completed 90 hours of formal classroom training in the use of investigative hypnosis. He had completed 40 hours of basic training in investigative hypnosis at the Law Enforcement Hypnosis Training School at Los Angeles, California, and his advanced training included subsequent sessions in Los Angeles and Orlando, Florida.

3. A record was made of the hypnotic sessions. Both of Linda's hypnotic sessions were videotaped. Although it appears that a record was not made of the thirty-minute period between the two hypnotic sessions, Agent Hilde was questioned at the trial as to his communications with Linda during the interval between the two sessions.

4. Prior to trial, the defense was made aware of the fact that the witness had been hypnotized. The record reflects that the State fully cooperated with defense counsel and made the videotaped recordings available for his inspection.

5. The evidence established that, at the time of the incident in question, the witness had ample opportunity to view her assailant. It is not disputed that Linda spent a substantial amount of time in the car with her assailant.

6. The jury was made fully aware of the fact that the witness had been hypnotized and of the attendant circumstances of the hypnotic sessions. As noted earlier herein, Agent Hilde was questioned by both the state's attorney and defense counsel regarding whether or not impermissible suggestion was used during Linda's hypnotic sessions. Both parties called expert witnesses who gave their opinions as to the reliability of hypnosis in general and as to the possibility of impermissible suggestion in Linda's case in particular. In addition, the jury was allowed to view the actions of the hypnotist in the videotapes of Linda's hypnotic sessions.

█ 7. The State did not introduce into evidence the videotapes of the hypnotic sessions in its case in chief for the purpose of proving the truth of the matters asserted by the witness. Rather, the videotapes were introduced during the State's rebuttal as part of the basis for the expert opinion.[10] Although jurisdictions are divided over the question of whether or not testimony of a

10. When the State offered in evidence the videotapes of the hypnotic sessions, the following colloquy took place:

"MR. SNYDER: Your Honor, I'm objecting to that exhibit. I think that . . . [Linda] has testified once already, and to allow this tape to be played would in effect be allowing her to testify twice, and I'm objecting to it on a cumulative ground.

"MR. OLSON: The State resists the objection, your Honor. The defense witness, Mr. Bernard Diamond, opened up this matter. He based a lot of his conclusions on reviewing this tape. Our rebuttal witness Dr. Reiser was presented. He also had observations of this tape. I think that this tape, the two sessions that we wish to have presented, are

very, very crucial to the determination to be made by this jury, and it's their decision.

"THE COURT: It's the Court's determination through this entire matter that the question, although argued extensively by both sides in this particular case, that the central question here, one of the questions is the acceptance or rejection by the jury of the complaining witness' testimony, that is to say, . . . [Linda's]. And in that regard, it is my position that at this particular time that that is evidence that the jury is entitled to weigh, and in that regard, the jury, I think, is entitled to have this particular evidence before it. And therefore, Exhibits Numbers 24 and 25 are received. The objections are noted and overruled. . . ."

witness whose memory has been aided by hypnosis is admissible, courts are legion in holding that the contents of actual hypnotic interviews are inadmissible for the purpose of proving that the facts recounted by the hypnotized witness actually occurred. *E.g., State v. Pusch,* 77 N.D. 860, 46 N.W.2d 508, 521–522 (1950); *State v. Peoples,* 60 N.C. App. 479, 299 S.E.2d 311, 314–315 (1983); *People v. Smith,* 117 Misc.2d 737, 459 N.Y. S.2d 528, 540 (Sup.Ct. Dutchess Cty.1983), and cases cited therein; *Greenfield v. Commonwealth,* 214 Va. 710, 204 S.E.2d 414, 419 (1974). We note, however, that in situations such as the one at bar, the trial court should exercise its discretion and weigh the probative value of the audio-visual recording as part of the basis for the expert's opinion against the risk that the jury might improperly consider it as independent proof of the facts recited by the witness. *See* Rule 403, N.D.R.Ev.; *State v. Schlickenmayer,* 334 N.W.2d 196, 199 (N.D.1983); *People v. Modesto,* 59 Cal.2d 722, 31 Cal. Rptr. 225, 382 P.2d 33, 39–40 (1963); *State v. Harris,* 241 Or. 224, 405 P.2d 492, 498–500 (1965). In this regard, a cautionary instruction might be appropriate. However, the record reflects that no such instruction was requested. Under the circumstances of this case we believe the trial court properly exercised its discretion.

8. The witness's identification of the defendant was corroborated by other evidence. The evidence established that several hours after the incident Brown was found in close proximity to Linda's automobile at the park. Brown also had in his possession Linda's yellow book bag which was taken from her station wagon, which had signs of having been recently driven. Before being placed under hypnosis, Linda "had a reaction", according to Detective Yeck, upon seeing Brown walking along Highway 83. At least one of Brown's explanations of his movements on the night of the incident would have placed him at the same time and place as Linda at the time her assailant entered her car. We further note that Linda's description of her assailant made during the later morning hours of June 4, 1982, before she was placed under hypnosis, was generally consistent with Brown's appearance.

The defense argues that Linda's description of her assailant was not a description of the person who actually attacked her, but was a description of a person she saw personally and in photographs on several occasions during the short period of time between the commission of the crime and the hypnotic sessions, *i.e.,* Brown. The State argues that Linda knew before the hypnotic sessions that Brown was her assailant, but because of her earlier misidentification of Larry as her assailant, and subsequent admonishment to her by police to be sure of the person's identity, she was reluctant to positively identify him. Those contentions were argued to the jury, and, as we have concluded, the ultimate determination was properly left to the jury.

We conclude that the trial court did not err in allowing Linda to testify and identify Brown as her assailant.

## IV. JURY INSTRUCTIONS

Brown also contends that the trial court erred in refusing to instruct the jury that the crime of kidnapping, a class A felony, includes the "essential element" that the actor did not voluntarily release the victim alive and in a safe place prior to trial. Section 12.1–18–01(2), N.D.C.C., provides that kidnapping is a class B felony if "the actor voluntarily releases the victim alive and in a safe place prior to trial". The trial court presented this issue to the jury in the form of an interrogatory.

We believe that this question has been rendered moot because the jury found Brown not guilty of kidnapping, but guilty of the lesser included offense of felonious restraint. Our court "has long indicated it will not issue advisory opinions". *Lips v. Meier,* 336 N.W.2d 346, 348 n. 5 (N.D.1983).

For the reasons stated in this opinion, the judgment of conviction is affirmed.

ERICKSTAD, C.J., and PEDERSON, SAND and VANDE WALLE, JJ., concur.

VANDE WALLE, Justice, concurring specially.

I concur in the opinion written for the court by Justice Paulson. It contains a thorough discussion of the various viewpoints in other jurisdictions, the pros and cons of the wisdom of admitting testimony of a previously hypnotized witness, as well as our conclusion on the matter. I write separately to indicate that although we have adopted the position that hypnosis affects the credibility but not the admissibility of a witness's testimony, I, for one, do not view our opinion as a carte blanche invitation to use hypnosis as an investigative tool in all instances. I believe the use of this procedure is justified only where the particular facts of the case are sufficient to indicate a necessity for its use. My concern is that prosecutors and investigators may read our opinion as indicating that hypnosis should be used as a normal investigative tool thus subjecting to the procedure all eyewitnesses or other witnesses who may have heard, smelled, tasted, or touched something in connection with the crime.

Justice Paulson has set forth several facts which are significant in regard to the instant case. They include the fact that Linda was unable to recall important portions of her ordeal with her assailant. A review of the evidence indicates far more than the normal confusion which may beset a victim in these circumstances. I obviously agree that a witness should be subjected to hypnosis only by someone adequately trained in the process and that the procedure specified in the majority opinion be followed. The procedure should not be attempted by amateurs.

Perhaps my thoughts evince some doubt on my part as to the efficacy of hypnosis; however, I am most concerned that the procedure not be used in those instances in which there is no clear and substantial reason for its use. Investigators or prosecutors should not use the procedure in the remote possibility some additional evidence may be forthcoming.

SAND, J., concurs.